EDWARD SPIEGEL *vs*. BEACON PARTICIPATIONS, INC., &
others.

Suffolk.   September 9, 10, 1935; May 29, 1937. — June 10, 1937.

Present: RUGG, C.J., PIERCE, FIELD, LUMMUS, & QUA, JJ.

*Corporation*, Officers and agents, Dividend, Purchase by corporation of
its own stock. *Negligence*, Of director. *Equity Pleading and Prac-
tice*, Master: report of evidence; Appeal; Findings by judge. *Dam-
ages*, For breach of contract. *Value. Words*, "Bad faith."

Although the rule to a master in a suit in equity did not direct him to
report the evidence in full, where he caused a transcript thereof to be
made and the judge who heard the case on his report certified that,
in passing upon exceptions to the report and motions relating thereto
it was necessary for him "to read all" the evidence, this court denied a
motion that the evidence be expunged from the printed record on
appeal from the final decree and considered it, so far as necessary, in
deciding issues presented by the appeal.

A judge hearing a suit in equity at various stages has power, at a later
stage, to alter or amend a decision made on the same evidence at an
earlier stage, and, upon an appeal to this court, his final finding must
be accepted as his ultimate conclusion.

Certain inconsistencies and imperfections in findings and rulings by a
trial judge at various stages in hearings of a suit in equity did not
show that his attitude was such as to render inapplicable the general
rule that upon an appeal in equity with a report of the evidence
findings by the trial judge on evidence wholly or partly oral will not
be reversed unless plainly wrong.

Statement by RUGG, C.J., of the standard of duty for directors of busi-
ness corporations.

Discussion by RUGG, C.J., of elements warranting a finding of bad faith
on the part of directors of a business corporation.

That there was an interlocking directorate between a trust company
and two affiliated corporations did not alone warrant a finding of
bad faith on the part of the directors of one affiliate in a transaction
benefiting the trust company if the organic articles of that corpora-
tion expressly authorized interlocking directorships.

Evidence did not warrant a finding by a judge who heard a minority
stockholder's suit that directors of an investment corporation, an
affiliate of a bank of which they also were directors, were guilty of
bad faith in purchasing from the bank without recourse to it a certain
large demand note of another affiliate of doubtful worth, and in not
seasonably requiring its payment, and such finding was plainly wrong;

but his finding of negligence of the directors in the transaction was warranted although the transaction was not illegal, and a decree giving the corporation relief was warranted.

In complicated circumstances, a finding by a master of the value in 1933 of shares of stock of a corporation owning real estate for which there was no market, where it appeared that the value found was based on intrinsic worth, disclosed no error of law.

In a minority stockholder's suit to charge directors of a corporation with culpable negligence in the purchase of a certain note, where it appeared that the transaction never was avoided but that the corporation later sold the note, damages should be assessed by charging the defendants with the amount the corporation paid for the note and interest thereon to the time it was sold and crediting them with the value of what was received in the sale of it, interest to be charged on the balance from the date of the sale to the date of the final decree.

A director of a corporation who knew the facts relating to an improper purchase of a note by the corporation and approved it was liable for negligence in the purchase although he was not present when authority for the purchase was voted; but directors afterwards elected were improperly held liable in the absence of evidence warranting findings that they could have prevented loss to the corporation by proper action on their part and of the extent of the loss resulting from their failure to act, if they did so fail.

A finding was not warranted that directors of an investment corporation acted in bad faith in making investments of corporate funds under an arrangement with a brokerage corporation controlled by two of them whereby the investment corporation wholly financed a joint stock account and there was an equal division of profits and losses; but a finding was warranted that such conduct of the directors was a breach of their fiduciary duty and negligent, and they properly were held liable in a minority stockholder's suit for the entire resultant net loss computed after the closing of the joint account and as of the date of a final hearing on the facts.

In a minority stockholder's suit, directors of a corporation were improperly charged with sums voted by them as dividends and paid out of capital instead of from profits where it appeared that rights of creditors were not prejudiced thereby.

Directors of an investment corporation having preferred and common stock were improperly held liable, in a suit by a minority stockholder, for causing the corporation to purchase out of capital in the open market at a fair price over half of its preferred stock to be held in its treasury and not retired, where it appeared that the organic articles of the corporation permitted it to purchase its own stock, that no harm resulted to its creditors, that the corporation was not deprived of funds needed for its business operations, and that remaining preferred stockholders were benefited thereby; a finding by the trial judge that such purchases caused a loss to the remaining preferred stockholders was plainly wrong; and ground for liability was not shown even if the purpose of the purchases was to benefit one who held all the common stock.

BILL IN EQUITY, filed in the Superior Court on September 26, 1932.

The suit was heard at various stages by *J. J. Burns*, J., and, after his resignation, a final decree was entered in accordance with his findings, rulings and order by direction of *Whiting*, J. The final decree was in substance as follows:

I.    A.    The defendants Charles F. Adams, Charles R. Gow, Charles B. Jopp, Frank B. Lawler, Gardner Poole, William P. Hart and Arthur T. Lyman be and the said defendants hereby are ordered to pay as damages to Beacon Participations, Inc., the sum of $461,166.66, together with interest thereon from July 25, 1933, to the date of entry of this decree, amounting to $33,972.61, a total of $495,139.27, and upon the payment of said total sum of $495,139.27 and such interest as may have accrued upon said sum from the date of entry of this decree, the ten shares of stock of Beacon Building Corporation now held by Beacon Participations, Inc., shall be turned over to the aforesaid defendants.

B.    That the defendant Allan H. Sturges be and the said defendant hereby is ordered to pay as damages to Beacon Participations, Inc., the sum of $58,896.63, with interest thereon from September 26, 1932, to the date of entry of this decree, amounting to $7,273.73, a total of $66,170.36.

C.    That the defendant George S. Mumford be and the said defendant hereby is ordered to pay as damages to Beacon Participations, Inc., the sum of $30,631.65, plus interest thereon from September 25, 1932, to the date of entry of this decree, amounting to $3,788.11, a total of $34,419.76.

II.    That within twenty days of the date of entry of this decree the defendants Charles R. Gow, Charles B. Jopp, Frank B. Lawler, Gardner Poole, William P. Hart, Arthur T. Lyman and Allan H. Sturges be and the said defendants hereby are ordered to pay as damages to Beacon Participations, Inc., in addition to the damages heretofore assessed, the sum of $145,037.82, plus interest thereon from

July 25, 1932, to the date of entry of this decree, amounting to $19,386.72, a total of $164,424.54; and that upon the payment of said total sum of $164,424.54 and such interest as may have accrued upon said sum from the date of entry of this decree, the directors so paying shall receive the securities now held by Beacon Participations, Inc., in the so called joint account.

III.   That within twenty days of the date of entry of this decree:

A.   The defendants Charles R. Gow, Charles B. Jopp, Frank B. Lawler, Gardner Poole, William P. Hart and Arthur T. Lyman be and the said defendants hereby are ordered to pay as damages, in addition to the damages heretofore assessed against them, to Beacon Participations, Inc., the sum of $283,547.80, together with interest thereon from September 26, 1932, to the date of entry of this decree, amounting to $35,018.15, a total of $318,565.95.

B.   That the defendant Charles F. Adams be and the said defendant hereby is ordered to pay as damages, in addition to the damages heretofore assessed against him, to Beacon Participations, Inc., the sum of $37,942.71, together with interest thereon from September 26, 1932, to the date of entry of this decree, amounting to $4,685.92, a total of $42,627.63 [sic].

C.   That the defendant Allan H. Sturges be and the said defendant hereby is ordered to pay as damages, in addition to the damages heretofore assessed against him, to Beacon Participations, Inc., the sum of $245,605.09, together with interest thereon from September 26, 1932, to the date of entry of this decree, amounting to $30,209.43, a total of $275,814.52.

D.   That the defendant George S. Mumford be and the said defendant hereby is ordered to pay as damages, in addition to the damages heretofore assessed against him, to Beacon Participations, Inc., the sum of $81,746.54, together with interest thereon from September 26, 1932, to the date of entry of this decree, amounting to $10,095.70, a total of $91,842.24.

IV.   That with reference to the purchase of Class A shares, within twenty days of the date of entry of this decree:

A.   That the defendant Charles R. Gow be and the said defendant hereby is ordered to pay as damages, in addition to the damages heretofore assessed against him, to Beacon Participations, Inc., the sum of $840,572.03, together with interest thereon from March 16, 1932, to the date of entry of this decree, amounting to $130,428.76, a total of $971,000.79.

B.   That the defendants Charles B. Jopp, Frank B. Lawler, Gardner Poole, William P. Hart, Allan H. Sturges and Arthur T. Lyman be and the said defendants hereby are ordered to pay as damages, in addition to the damages heretofore assessed against them, to Beacon Participations, Inc., the sum of $858,906.57, with interest thereon from November 1, 1933, to the date of entry of this decree, amounting to $49,530.28, a total of $908,436.85.

C.   That the defendant George S. Mumford be and the said defendant hereby is ordered to pay as damages, in addition to the damages heretofore assessed against him, to Beacon Participations, Inc., the sum of $220,579.71, with interest thereon from November 1, 1933, to the date of entry of this decree, amounting to $12,720.10, a total of $233,299.81.

D.   That upon the payment by the said defendants of the total amount of the claim of Beacon Participations, Inc., in connection with the purchase of the said Class A shares, namely, the sum of $971,000.79, and such interest as may have accrued from the date of this decree, the corporation shall turn over to the defendants in proportion to the amounts paid by them the Class A shares purchased by the corporation.

V.   That the defendants Charles F. Adams, Charles R. Gow, Charles B. Jopp, Frank B. Lawler, Gardner Poole, William P. Hart, Arthur T. Lyman, Allan H. Sturges and George S. Mumford be and the said defendants hereby are ordered to pay to the plaintiff costs in the amount of $21 and execution is ordered to issue therefor.

VI.   That the bill of complaint be and is hereby dismissed as against the defendants Robert G. Shaw, Jr., and Fred D. Jordan.

The defendants appealed.

*S. C. Rand,* (*P. H. Rhinelander.* with him,) for the defendants Lyman and Mumford.

*S. Hoar,* (*R. R. Duncan & L. Wheeler, Jr.,* with him,) for the defendant Adams.

*A. L. Brown,* (*G. L. Mayberry* with him,) for the defendants Gow, Sturges and Poole.

*D. Stoneman,* for the defendant Jopp, submitted a brief.

*H. S. Davis,* for the defendant Hart, submitted a brief.

*E. V. Grabill,* for the defendant Lawler, submitted a brief.

*R. T. Bushnell & J. Lewiton,* (*G. A. Murphy* with them,) for the plaintiff.

Rugg, C.J.   This suit in equity was filed on September 26, 1932.   The plaintiff, in 1928, purchased and still owns twenty-five shares of class A stock of Beacon Participations, Inc. (hereafter called the defendant), a corporation organized on May 11, 1928, under the laws of this Commonwealth. The defendant was organized by the active directors of the Beacon Trust Company (hereafter called the bank) to buy, sell and deal generally in stocks, bonds and securities.   It is charged in the bill that the defendant has claims against its present and former directors and that the present directors, by reason of personal interest and being nominees of guilty directors, are not proper persons to be intrusted with the prosecution of this proceeding; that it is brought by the plaintiff as a minority stockholder in behalf of the defendant and of the plaintiff and other stockholders who may choose to join.   There is no intervening petition by other stockholders before this court.   The plaintiff prosecutes the suit alone.   The allegations of the bill fall into four classes: 1. The defendant directors are liable to the defendant because, on June 4, 1928, they caused it to buy from the bank, for the price of its face value of $520,000, a note of Beacon Building Trust, Inc. (an affiliate of the bank), payable to the bank and indorsed by it without recourse.

The defendant was an affiliate of the bank, and all of its directors with a single exception were directors of the bank. At that time, the note was of little or no value, as the individual defendants then knew, and its maker was not financially responsible. The purchase was made to further the interests of the bank rather than those of the defendant; and the individual defendants, in disregard of their obligations to the defendant, caused it to buy the note. This was a wrongful, improper, unsound and imprudent use of the funds of the defendant, and the investment was allowed to continue until it became utterly worthless. 2. The individual defendants caused losses to the defendant by illegal and improper use of its funds in a joint trading account with The Jordan Lyman Company (Inc.) a Massachusetts corporation dealing in securities, of which the defendants Jordan and Lyman were officers and directors, without requiring said corporation in the first instance to furnish its proportionate share of the necessary capital or adequate security therefor, and by culpable neglect in failing to demand security when a threatened loss became apparent. 3. The individual defendants illegally declared and caused to be paid dividends out of the capital of the defendant at times when there were no net earnings or surplus out of which such dividends could rightly be paid. 4. The individual defendants caused the defendant to purchase in the open market shares of its own class A stock, and to pay for the same out of its treasury large sums of money, at excessive prices, at a time when its capital was impaired.

The defendant filed a plea in bar denying that the present directors were nominees of the former directors, or that the members of the new board of directors had neglected their duties, and asserting that as a board they had not had adequate time before his suit was brought to investigate the charges made by the plaintiff. The individual defendants filed answers in which was a denial of any impropriety or illegality of action on their part. The case then was heard upon the plea in bar and upon the merits before a judge of the Superior Court. That hearing was strictly limited to the plea in bar and to the question of liability,

and was not concerned with the issue of damages. All the evidence presented at that hearing is before this court as a part of the record on appeal. The trial judge at the conclusion of the hearing filed findings of facts, which included certain rulings of law. (The document containing these findings and rulings was incorrectly entitled "Memorandum of Findings." *Commonwealth* v. *Marrelli*, 266 Mass. 113, 115, and cases cited.) The trial judge overruled the plea in bar and found various individual defendants liable on each of the four classes of wrongs specified in the bill. The case then was referred to a master "to hear the parties and their evidence on the question of damages, and to report to the court his findings of fact not inconsistent with the findings in said memorandum [meaning the findings of fact and rulings of law already described and filed by the trial judge] together with such evidence as may be necessary properly to present for determination the correctness of any ruling of law requested by any party." This limitation upon the powers of the master, taken in connection with the findings made by the trial judge, raised serious difficulties as to the admissibility and effect of testimony before the master. After the hearing had proceeded for several days, the master made an interlocutory report setting forth those difficulties. There was a hearing on that report before the trial judge. Counsel for individual defendants pointed out to him that the trial before him "was limited to the issue of liability," as stated twice during the trial and explicitly embodied in his findings, and argued the injustice to them of being finally bound by findings made by him which related to damages. The trial judge felt that there were no difficulties and ruled that the decree appointing the master was not ambiguous, and that it referred to "all the findings" set forth in his so called "memorandum." The hearings then proceeded before the master under that ruling. The master's report was filed on August 16, 1934. There were numerous objections by both the plaintiff and the individual defendants, and the individual defendants filed motions to recommit to the master. At the hearing on these matters, the trial judge called for a transcript of the

testimony before the master, which appears to have been taken stenographically and typed, and it was presented to him by the defendants, although there had been no order to the master to report the evidence in full. The trial judge deemed that it was necessary, in passing upon the objections and motions, to read and consider all this evidence. It is a part of the printed record before us. On September 15, 1934, the resignation of the trial judge from the Superior Court took effect, but on that day he filed "Findings and Rulings and Order for Decree," whereby further findings of fact were made and orders made for the entry of decrees overruling the defendants' motions to recommit and all exceptions to the master's report, and for the entry of a final decree charging the individual defendants with the payment to the defendant of large sums of money. The record consists of the pleadings, except the plea in bar which is not printed and from the overruling of which there is no appeal; the testimony before the trial judge at the hearing which "was limited to the issue of liability"; the findings of fact and rulings of law resulting from that hearing made by the trial judge and filed on July 6, 1933, supplemented by amended further findings of fact filed on September 15, 1934, as a part of the order for final decree; the decree appointing the master and the interpretation of that decree by the trial judge; the master's report; transcript of the evidence before the master; various interlocutory orders of the trial judge and his order for final decree; the final decree and appeals by the individual defendants from adverse decrees; as well as some other subsidiary and incidental proceedings.

There was no order to the master to report in full the evidence before him and he rightly did not attempt to report it. Limitations set forth in the decree appointing a master commonly are binding upon him and restrict his powers. *Cook* v. *Scheffreen,* 215 Mass. 444, 448. *Bradley* v. *Borden,* 223 Mass. 575, 586. *Smith* v. *Lloyd,* 224 Mass. 173. But the trial judge filed a certificate to the effect that in "passing upon the objections and motions" accompanying the master's report it was necessary for him "to

read all the testimony presented before the master." Since the trial judge deemed it necessary to read a transcript of all the evidence heard by the master and to identify it by his certificate, and since he subsequently filed further findings and rulings, the plaintiff cannot complain that such evidence has been printed as a part of this record. So far as necessary, it will be considered in deciding the issues here depending. A motion by the plaintiff to expunge this evidence from the record was presented to this court some days previous to the arguments at the bar and was denied.

Certain general considerations have been raised by the defendants, which must be decided at the outset. This is a suit in equity. It comes before us on appeal from a final decree with findings of fact made by the trial judge and a full report of the evidence, most of which was heard orally. In such circumstances, where the findings of fact are assailed, the duty of this court is to examine the evidence and decide the case according to its own judgment as to the facts, giving due weight to the findings of the trial judge; but those findings will not be reversed unless plainly wrong. The reason for this rule is that the judge who has heard the testimony and seen the witnesses face to face has a better opportunity for determining the credibility of their conflicting statements than can possibly arise from reading a record; he "has a great advantage in the search for truth over those who can only read their written or printed words." *Dickinson* v. *Todd*, 172 Mass. 183, 184. *Reed* v. *Reed*, 114 Mass. 372. *Weinstein* v. *Miller*, 249 Mass. 516, 520. *Swan* v. *Justices of the Superior Court*, 222 Mass. 542, 547. *Berman* v. *Coakley*, 257 Mass. 159, 162. *Bankers Trust Co.* v. *Dockham*, 279 Mass. 199, 200. *Tuells* v. *Flint*, 283 Mass. 106, 108, 109. *Hollidge* v. *Colonial Trust Co.* 290 Mass. 52. *Bratt* v. *Cox*, 290 Mass. 553, 557, 558. *Trade Mutual Liability Ins. Co.* v. *Peters*, 291 Mass. 79, 83–84. *Wyness* v. *Crowley*, 292 Mass. 459, 460. *O'Reilly* v. *O'Reilly*, 293 Mass. 332, 333. *Reid* v. *Aberdeen, Newcastle, & Hull Steam Co.* L. R. 2 P. C. 245, 248. When this court is asked on appeal with full report of all the evidence to revise the

findings of the trial judge, it is "only in a very clear and exceptional case that this can be done, when the court of first instance has seen and heard the witnesses." *Thomas v. Beals,* 154 Mass. 51, 52. There are cases, however, where such findings have been changed in whole or in part on appeal, because plainly wrong. *Jenkins* v. *Trustees of Andover Theological Seminary,* 205 Mass. 376, 383. *Rubenstein* v. *Lottow,* 220 Mass. 156, 165, 166, 170. *Draper* v. *Draper,* 267 Mass. 528. *Allen* v. *French,* 178 Mass. 539. *Commercial Credit Corp.* v. *Gould,* 275 Mass. 48, 52. *King* v. *Grace,* 293 Mass. 244, 251. *Greeley* v. *O'Connor,* 294 Mass. 527, 532. *Yankee Network, Inc.* v. *Gibbs,* 295 Mass. 56, 59. *Kagan* v. *Wattendorf & Co. Inc.* 294 Mass. 588, 595.

The defendants contend that this general rule in favor of the findings of the trial judge ought not to be applied in the case at bar. Various arguments are put forward in support of that contention. They urge that the plaintiff, as shown by his testimony, is not actuated by a desire to obtain redress for real grievances suffered by himself or his fellow stockholders or the defendant, but by a design to constrain the directors to buy their peace by purchasing his stock at an inflated valuation, citing the pungent comments upon such conduct in *Fullerton* v. *Crawford,* 59 Canada Sup. Ct. 314, 324. Whatever may be said upon this point, the question to be decided in the instant case is whether a wrong for which the law affords a remedy has been done to the defendant by its directors. *Bartlett* v. *New York, New Haven & Hartford Railroad,* 221 Mass. 530, 531. *Hayden* v. *Perfection Cooler Co.* 227 Mass. 589, 591. The circumstance is pressed that, although the trial judge described the business experience of individual defendants and in effect stated that they were of exceptionally high reputation in the community, he discarded their testimony and made "findings directly contrary to this great mass of trustworthy and uncontradicted evidence" proffered by them. Wholesale disbelief of testimony of unimpeached witnesses is said to cast a shadow upon the findings. . The principle is invoked that in such conditions every presumption is in favor of honesty and good faith. *Barron* v. *Inter-*

*national Trust Co.* 184 Mass. 440, 443. *Chesapeake & Ohio Railway* v. *Martin,* 283 U. S. 209, 216. *Pennsylvania Railroad* v. *Chamberlain,* 288 U. S. 333, 340. In this Commonwealth the credibility of witnesses who testify orally and the weight of their evidence are commonly for the fact-finding tribunal, *Topjian* v. *Boston Casing Co. Inc.* 288 Mass. 167, but they are subject to review in equity appeals. *Harding* v. *Studley,* 294 Mass. 193, 194.

The contention is made that the attitude of the trial judge was "so extraordinary as to deprive the defendants of the fair hearing which is the first essential of every judicial proceeding." The value of the $520,000 note when acquired by the defendant was material on several points. The trial judge in substance and effect found this value to be not less than $435,000 when he stated in his first findings, filed on July 6, 1933, that that sum was "a fair estimate of the value (in the sense of market value) of the net assets of the maker of this note." In another place the judge calls the purchase of this note "a waste of the stockholders' money." Again in those findings, the trial judge referred to this "worthless note." In his findings filed on September 15, 1934, after the master's report was filed, the trial judge said that, "while this term might not be strictly accurate," he found on all the testimony that the note was worth not more than $200,000 when it was bought by the defendant. No categorical testimony by any witness supported that valuation. It is to be regarded as the opinion of the trial judge formed on conflicting evidence. The judge then proceeded to say that the master's finding that the note was worth $435,000 on that date was erroneous. The master's finding, we think, was right, in view of the decree under which he was conducting the hearing, requiring him to make no findings of fact inconsistent with those already made by the trial judge. These various statements by the trial judge as to the same fact are not quite so unjudicial in nature as to warrant setting them aside or refusing to accept his matured opinion. The trial judge had power to alter or amend his decision as to the value of the note at the time of its purchase by the defendant, on

the same evidence, at any time during the pendency of the proceedings before him. The final finding must be accepted as his ultimate conclusion. *Boyd, petitioner,* 199 Mass. 262. *Waucantuck Mills* v. *Magee Carpet Co.* 225 Mass. 31, 33, and cases cited. *Commonwealth* v. *Rice,* 216 Mass. 480. *Jamnback* v. *Aamunkoitto Temperance Society, Inc.* 273 Mass. 45, 50. *Twin Falls Salmon River Land & Water Co.* v. *Caldwell,* 266 U. S. 85.

Complaint is made of the statement by the trial judge that the bank "in the days of bigger and costlier buildings, put too much money in the erection of its banking house. There was a violation of the spirit, if not the letter," of G. L. c. 172, § 41, as amended by St. 1922, c. 321, "limiting the amount of real estate which a Massachusetts trust company might properly hold." This statement does not give due effect to St. 1923, c. 168, whereby the bank was authorized to hold real estate used in whole or in part for the transaction of its business to the amount of $1,700,000 in addition to the amount permitted by general law. The evidence does not support the statement as to violation of the cited statute.

It is not necessary to pursue these contentions in further detail. Notwithstanding these imperfections, we think that it cannot be held that the attitude of the trial judge, as disclosed by the record, was such as to render inapplicable the general equity rule that his findings will not be reversed unless plainly wrong.

The standard of duty established by the law for directors of a corporation such as the defendant is settled. The defendant was a business corporation organized for the purpose of trading in stocks, bonds and securities. It involved none of the special incidents attaching to banking corporations. The directors of an ordinary business corporation often have been called trustees and their relation to the corporation is at least fiduciary. They are bound to act with absolute fidelity and must place their duties to the corporation above every other financial or business obligation. They must act, also, with reasonable intelligence, although they cannot be held responsible for mere errors of

judgment or want of prudence. They cannot be permitted to serve two masters whose interests are antagonistic. They are liable if, through their bad faith, financial loss to the corporation results. They are responsible if they unlawfully divert the assets of the corporation. If directors, acting in good faith, nevertheless act imprudently, they cannot ordinarily be held to personal responsibility for loss unless there is "clear and gross negligence" in their conduct. *Overend & Gurney Co.* v. *Gibb*, L. R. 5 H. L. 480, 493–495. Within these somewhat general limits, each case must depend upon its peculiar facts. *Elliott* v. *Baker*, 194 Mass. 518, 523. *United Zinc Co.* v. *Harwood*, 216 Mass. 474, 476. *Abbot* v. *Waltham Watch Co.* 260 Mass. 81, 96. *Albert E. Touchet, Inc.* v. *Touchet*, 264 Mass. 499, 507. *Brown* v. *Little, Brown & Co. (Inc.)* 269 Mass. 102, 117. *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 137, 138. *Hathaway* v. *Huntley*, 284 Mass. 587, 591. *Manning* v. *Campbell*, 264 Mass. 386, 390, 391. *Sagalyn* v. *Meekins, Packard & Wheat Inc.* 290 Mass. 434, 438. *Commissioner of Banks* v. *Harrigan*, 291 Mass. 353, 355. *Baker* v. *Allen*, 292 Mass. 169, 172. *Dovey* v. *Cory*, [1901] A. C. 477, 488. *In re City Equitable Fire Ins. Co. Ltd.* [1925] Ch. 407, 426–430.

An individual director cannot be held liable except for the results of his own misconduct. He is not responsible for the consequences of the wrongful conduct of other directors in which he did not participate. *Cosmopolitan Trust Co.* v. *Mitchell*, 242 Mass. 95, 122. *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 138.

It was said in *Geddes* v. *Anaconda Copper Mining Co.* 254 U. S. 590, at page 599: "The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or

in character." That principle is not involved in the view we take of the case at bar. Commonly, the burden of proof in a suit by or in behalf of a corporation against its officers or directors is on the plaintiff to show misconduct. *Crowell & Thurlow Steamship Co.* v. *Crowell,* 280 Mass. 343, 352, 359. *Columbian Insecticide Co.* v. *Driscoll,* 271 Mass. 74, 78. *Meyer* v. *Fort Hill Engraving Co.* 249 Mass. 302, 306. *Von Arnim* v. *American Tube Works,* 188 Mass. 515, 517. Moreover, the corporate organization of the defendant through its charter and by-laws permitted the defendants who were directors to serve and act upon interlocking directorates.

The findings of fact made by the trial judge with respect to the alleged breach of duty by the individual defendants as directors of the defendant touching the $520,000 note of the Beacon Building Trust, Inc., may be summarized as follows: The defendant was an affiliate of the bank. It was similar to many other such corporations created in connection with banks within the last fifteen years with unlimited powers of investment and freedom from administrative supervision by public officers. The defendant, under its by-laws as amended five days after its organization, had one hundred thousand shares of class A preferred stock, twenty-five thousand shares of class B preferred stock, and twenty-five thousand shares of common stock, all without par value. Holders of class A stock were entitled to preference and cumulative dividends at the rate of $1 per share in advance of any dividend on other classes of stock. In liquidation, holders of class A stock were to receive $20 per share, and, after payment of $20 per share to holders of class B stock, the balance was to be divided, forty per cent to holders of class A stock, ten per cent to holders of class B stock, and the residue to holders of common stock. Voting rights were reserved exclusively to holders of common stock, except that when there had been four quarterly preferential dividends accrued and unpaid upon class A stock after June 1, 1929, holders of class A stock could vote, and also, under certain conditions, holders of class B stock. Other amendments permitted the defendant cor-

poration to purchase or acquire, hold, sell and otherwise dispose of shares of its own capital stock, and provided that this should not be deemed a reduction of its capital stock. No director was to be disqualified by his office from holding any office or place of profit under the defendant or any other corporation in which the defendant was a stockholder or otherwise interested, or from dealing as director of the defendant with other corporations in which he was a director or officer. This is a long article. It need not be quoted. It was designed to permit interlocking directorates of a broad nature, and to give wide power to each director to be a director in other companies with which the defendant transacted business and to engage in transactions in behalf of the defendant with other corporations and associations in which any of the directors might be interested, provided the nature of his interest was disclosed. Shortly after the organization of the defendant, its directors were elected. Its class A stock was sold and marketed to the public through The Jordan Lyman Company (Inc.), the controlling interest in which was owned by the defendants Jordan and Lyman. From this sale the defendant, about June 1, 1928, received $1,900,000. The bank bought the common stock of the defendant for $1,000, and the entire issue of its class B stock for $500,000. The bank was made depositary and appointed transfer agent of the defendant. On June 4, 1928, the defendant, acting through the individual defendant Jopp, purchased from the bank "a promissory note dated February 2, 1925, originally payable in the sum of $545,000 but at the time of purchase payable in the sum of $520,000, signed by the Beacon Building Trust, Inc., Charles B. Jopp, President, R. G. Shaw, Treasurer, and indorsed by the" bank without recourse. For this note, which was payable on demand, the defendant paid the sum of $520,000 in cash. This transaction was not passed upon by the directors of the defendant as a group until June 21, 1928, when the purchase was approved. The Beacon Building Trust, Inc., was also an affiliate of the bank, which owned all its stock. Its board of directors were Jopp, Shaw (who was at the same time treasurer of the bank

and of the defendant), and one Haskell, a vice-president of the bank. With the exception of Lyman, all the directors of the defendant were directors of the bank. The Beacon Building Trust, Inc., owned the equity in the Beacon Building at 31 Milk Street, Boston, where was the main place of business of the bank, and in the Fiske Building at 89 State Street, where the bank maintained a branch. The net value of the Fiske Building above a first mortgage was found to be $120,000. The Beacon Building Trust, Inc., or its predecessor, bought the land at 31 Milk Street in 1921 for $1,050,000, and in 1924 erected on that land a modern eleven-story office building of fireproof construction at a cost of $1,444,231.40. The financing was accomplished by the sale of first mortgage bonds in the amount of $1,500,000, by borrowing $200,000 from a savings bank and by an unsecured loan of $845,000 from the bank. This loan was reduced in 1925 by setting up a fixture account for $300,000, and at some time by a payment of $20,000. The trial judge, in determining the value of this note, which is the one here in controversy, manifestly gave great credence to a real estate expert called as a witness by the plaintiff, stating that his evidence was more reliable than that of the expert called by the defendants. The trial judge stated that both experts at the time of the trial were acting in a tax case for principals whose objectives were the reverse of those in the suit at bar. There is no evidence to support this finding as to the expert called by the defendants. According to one statement in the findings filed on July 6, 1933, the trial judge found that $435,000 was "a fair estimate of the value (in the sense of market value) of the net assets of the maker of this note." It has been strongly argued by the defendants that, in reaching this conclusion, the trial judge not only failed to give adequate weight to the emphatic testimony of other witnesses expressing an opinion of higher value, but omitted to attribute due importance to the $2,494,231.40 actually expended for the property only four years earlier. Other findings are that the directors of the defendant who approved the purchase of the note made no proper investigation of its worth.

No independent appraisal was secured. The note in the hands of the bank was a hazardous investment. The defendant "was organized for the purpose, among other things, of buying this note." The defendant furnished an ideal "dumping ground" "because the shareholders had no direct claims against the corporation." There is no charge in the bill and no evidence that the individual defendants received any profits or any property or money from the defendant or from any other source in connection with the note. The trial judge found expressly that the plaintiff "failed to show any profit to the individual directors in the note transaction." The first floor of the building at 31 Milk Street was leased to the bank for a term of twenty years at an annual rental of $100,000. Although this "attractive lease" apparently gave an added value to the note, the trial judge thought that the primary consideration of those who executed the lease was for the bank as lessee rather than for the Beacon Building Trust, Inc., the lessor. The trial judge also found: "Even assuming that the directors had made an investigation prior to this note transaction, and assuming further that they honestly believed in the figures testified to by Kenney, and assuming further that they believed the statement of Sleeper and Dunlop in the prospectus to the bondholders (which statement was in fact sales talk by building managers who knew nothing of values), nevertheless the fact remains that they put $520,000 of their funds, in their control under obligations as fiduciaries, in a corporation which at no time was able to pay on demand." "The luckless plight of the corporation [the defendant] which was the inescapable and inevitable result of the same directors acting on three sides of the transaction, is clearly indicated by what took place after the purchase of the note. There should have been someone on the board to look out for this investment of a half million dollars. The important question of when to make demand had to be decided. It ought not to have been determined on the basis of what was best for the bank, yet not one director suggested that the note be called even though the value of the note was steadily

depreciating. In 1930 all the directors agreed that the note was worth but fifty per cent of its face value. Even then no attempt was made to collect the note or to secure a partial payment on principal." It is not necessary to pursue the argument of the trial judge in further detail, or to deal at greater length with the criticisms by the defendants. It is enough to say that he found that the directors were "chargeable with misconduct in making" the investment in the note, that they failed to take any steps to protect the rights of the defendant, that, although the bank was under some moral or economic obligation to go to extremes in order to prevent a default on the note of its affiliate which owned its banking quarters, the individual defendants, "by reason of their zeal" for the interests of the bank, "were guilty of bad faith toward" the defendant.

"Bad faith" is a general and somewhat indefinite term. It has no constricted meaning. It cannot be defined with exactness. It is not simply bad judgment. It is not merely negligence. It imports a dishonest purpose or some moral obliquity. It implies conscious doing of wrong. It means a breach of a known duty through some motive of interest or ill will. It partakes of the nature of fraud. *Browning* v. *Fidelity Trust Co.* 250 Fed. 321, 325. *Hilker* v. *Western Automobile Ins. Co.* 204 Wis. 1, 13. *Bundy* v. *Commercial Credit Co.* 202 N. C. 604, 607. *Hilgenberg* v. *Northup*, 134 Ind. 92, 94. It was said by Taft, J., in *Penn Mutual Life Ins. Co.* v. *Mechanics' Savings Bank & Trust Co.* 73 Fed. 653, 654: "'In bad faith' is not a technical term used only in actions for deceit. It is an ordinary expression, the meaning of which is not doubtful. It means 'with actual intent to mislead or deceive another.' It refers to a real and actual state of mind capable of both direct and circumstantial proof." This finding of "bad faith," in our opinion, is not supported by the evidence and is plainly wrong. There are no definite facts in the evidence showing bad faith. The finding of bad faith rests upon no testimony but is at most an inference from subsidiary considerations not inconsistent with good faith. Every presumption of the law is in favor of honesty and

good faith.  *Brown* v. *Little, Brown & Co.* (*Inc.*) 269 Mass. 102, 117.  *Anderson* v. *Bean*, 272 Mass. 432, 444.  *Gardiner* v. *Rogers*, 267 Mass. 274, 278.  *Hallett* v. *Moore*, 282 Mass. 380, 397.  The finding as to "bad faith" appears to rest largely upon the circumstance that the individual defendants were directors of the bank as well as of the defendant, and that one was also a director of the Beacon Building Trust, Inc.  But such interlocking directorates were expressly permitted by the corporate organization of the defendant.  Of course, this gave no immunity to the defendant directors to be guilty of bad faith.  But it exonerates them from adverse inferences which might otherwise be drawn against them from the mere fact of the interlocking directorates.  Such provisions were not contrary to any statute of the Commonwealth existing at the time here in question.  Such exculpatory provisions in the organic by-law provisions of a corporation ought to be given the same effect as in other trust instruments.  *Old Colony Trust Co.* v. *Shaw*, 261 Mass. 158, 166, 167.  *North Adams National Bank* v. *Curtiss*, 278 Mass. 471.  *Warren* v. *Pazolt*, 203 Mass. 328, 347.  *Worcester Bank & Trust Co.* v. *Nordblom*, 285 Mass. 22.  *In re Trusts of Leeds City Brewery, Ltd.* [1925] Ch. 532.  It is to be remembered that the note was purchased in 1928, when business in Boston and throughout the country was highly prosperous.  The individual defendants who made the sale and purchase of the note, all were familiar with the cost of the building at 31 Milk Street.  Some of them had been on the committee of the directors of the bank which had charge of its construction only four years earlier.  There had been then actually expended for building and land $2,494,231.40.  "Cost in and of itself, though far from conclusive, is still evidence of value . . . especially where there is no market value in the strict or proper sense."  *McCandless* v. *Furlaud*, 296 U. S. 140, 158.  The great depression began in the autumn of 1929 and, of course, suddenly affected very adversely the values of the properties here involved.  As already pointed out, the trial judge described the "character of the personnel of the board of directors" as standing

high in the community. Other findings, to the effect that the individual defendants, in 1928, failed to exercise sound judgment and were highly inattentive to their duties and did not use reasonable care in buying the note, must stand. The findings of the trial judge already recited show a degree of culpable negligence, lack of sagacity, and reckless indifference as to the note transaction which render the directors who participated in it liable to the defendant for breach of the standard of duty required of them and heretofore stated, apart from bad faith.

This suit is not based upon rescission of the contract for the purchase of the note. The defendant, by selling the note, became powerless to return it. Moreover, a proceeding for rescission of a contract of sale can be brought only between the parties to it. The defendant bought the note of the bank. The bank is not a party to this suit. The Atlantic National Bank of Boston, which succeeded to the rights of the bank, is not a party. Rescission is not within the allegations of the plaintiff's bill. The purchase of the note by the defendant was not illegal or void. The note was a kind of property in which the defendant was authorized to deal. Title to it passed to the defendant on its purchase. The transaction was not illegal or *ultra vires*. The case on this point is distinguishable from *Corsicana National Bank* v. *Johnson*, 251 U. S. 68. In that case the transaction under inquiry was illegal and void under the governing statute, and the liability of the offending director to indemnify became immediate and coextensive with the amount paid out. In the case at bar, even apart from the corporate organization of the defendant, the circumstance of interlocking directorates would at most make the purchase of the note voidable and not void. *Union Pacific Railroad* v. *Credit Mobilier of America*, 135 Mass. 367, 376. *Kelley* v. *Newburyport & Amesbury Horse Railroad*, 141 Mass. 496, 499. *Calnan* v. *Guaranty Security Corp.* 271 Mass. 533, 544. That transaction stood as valid until avoided. It has never been avoided. It appears that, in July, 1933, the defendant made an adjustment whereby it transferred the note here in question to The Atlantic Na-

tional Bank of Boston as successor of the bank and received for the note $100,000 in cash and ten shares, being one half the shares of stock, in the Beacon Building Corporation, which at that time owned the equity in the real estate at 31 Milk Street subject to a mortgage for $900,000. These shares of stock were something of value received by the defendant as partial consideration for the transfer of the note. That stock was purchased by the defendant in dealing with the note as its property and has been retained by it. No allowance has been made for that stock except that, in the final decree, it is ordered that the defendant shall turn over to the defendant directors responsible for the loss on the note, upon the payment of the sum required of them, those shares of stock. There is grave doubt whether the court has power to order the defendant to transfer stock thus acquired to these defendants. However that may be, we think the proper way to ascertain the damages on this branch of the case is to determine the fair cash value of that stock in July, 1933, and credit that sum as a payment on account of the liability of these defendant directors. The acquisition of that stock was not an investment of moneys of the defendant by its directors in violation of their duty, but was an independent transaction by the defendant. The case at bar is distinguishable in this particular, also, from *Corsicana National Bank* v. *Johnson,* 251 U. S. 68, and other cases on which the plaintiff relies. The master found that the value of those ten shares of stock thus received by the defendant at the time of the settlement of the note in July, 1933, was $293,453.76. We are not impressed with the criticism upon that valuation made by the trial judge in his findings and rulings and order for decree filed in September, 1934. The judge's method of determining that valuation, also, is not clear. The master does not state the theory of valuation adopted by him further than to say that he has adopted "the actuarial method of depreciation." It appears to be based upon the income received, less deduction of necessary expenses. It is not based on fair cash value. Property may have a fair value even though it has no value for instant sale. The master

found further that there was no market for the real estate owned by the Beacon Building Corporation, but that the values which he has found "are market values." They are based on intrinsic worth. This was the correct course to follow. *Murray* v. *Stanton*, 99 Mass. 345, 348. *Handforth* v. *Maynard*, 154 Mass. 414. *Hagar* v. *Norton*, 188 Mass. 47, 52. *Woonsocket Machine & Press Co.* v. *New York, New Haven & Hartford Railroad*, 239 Mass. 211, 214. *Virginia* v. *West Virginia*, 238 U. S. 202, 213. The method of determining value adopted by the master is not established as a rule of law. In the complicated circumstances here disclosed, it seems as reasonable and as likely to do justice as any put forward. This valuation by the master does not appear to be tainted by any error of law.

The master also found that the unpaid interest on the note on July 25, 1933, amounted to $41,166.66. Certain individual defendants are responsible for the amount wrongfully paid for the note out of the treasury of the defendant, and they are entitled to credit for the salvage thereon. *Medford Trust Co.* v. *McKnight*, 292 Mass. 1, 38. *Cunningham* v. *Commissioner of Banks*, 249 Mass. 401, 429. It follows that the measure of damages on this branch of the case is the amount paid for the note, $520,000, plus the amount of interest due thereon on July 25, 1933, $41,166.66; against this total there should be credited as of July 25, 1933, (1) the cash received by the defendant on account of the transfer of the note and (2) the value of the shares of stock, as found by the master, received by the defendant on account of such transfer. This is the net loss to the defendant, even though some of the credits have been received since the institution of the present suit. That sum should bear interest at the legal rate from July 25, 1933, to the date of the final decree. *Medford Trust Co.* v. *McKnight*, 292 Mass. 1, 41. Thus the rights of the parties will be adjusted as of the date of the final decree. *Day* v. *Mills*, 213 Mass. 585, 587. *Millett* v. *Temple*, 285 Mass. 87.

The trial judge found that the defendants Jopp, Adams, Gow, Hart, Lawler, Lyman and Poole were chargeable

with misconduct in respect to the note investment. As already pointed out, in our opinion the burden of proof is on the plaintiff to show the loss sustained by the defendant by the misconduct of the several defendants. The defendant Lyman was a director of the defendant from the outset. Although not present at the meeting of the directors at which the purchase of the note was voted, yet he recognized his responsibility for a single investment of such a large proportion of the assets of the defendant. He made a thorough investigation of its quality and unqualifiedly approved its purchase. In these circumstances, we think that he must be held responsible for this investment equally with the others just named. The defendant Sturges was not elected a director until March, 1929, and Mumford did not assume office as a director until August, 1930. Manifestly, they are not responsible for any events occurring prior to their qualification. The master rightly ruled that, before either of these defendants could be held responsible, it must be found (1) that loss could have been prevented by proper action on their part, and (2) that the extent of that loss as a result of their failure to take such action must be established. He found, for reasons adequately stated by him, that there was no evidence sufficient to determine either of those points, and that, consequently, he was unable to assess any damages against either of these defendants on this branch of the case. That finding must stand and these two defendants be omitted from the first paragraph of the final decree.

The result is that paragraph I of the final decree must be struck out and a new paragraph inserted in its place covering this branch of the case in conformity to this opinion.

The facts in relation to the joint account of the defendant with The Jordan Lyman Company (Inc.) were found by the trial judge to be in substance as follows: The Jordan Lyman Company (Inc.) was a corporation in Boston dealing in unlisted securities, with a capital and surplus which, in March, 1929, did not exceed $200,000. Its stock was owned principally by Jordan, a director of the defendant not served with process in this suit, and Lyman, who is a

defendant. An agreement between that corporation and the defendant was made about March 20, 1929. Whether it was in writing was in doubt. If in writing, no copy of it could be found. It was not in dispute that the agreement in part was that the defendant would advance money to pay in full for stock to be carried in the names of both parties. The Jordan Lyman Company (Inc.) was to share half the losses and to receive half the profits, but was not to advance or invest any money. The total investment of securities purchased on this joint account exceeded the total capital and surplus of The Jordan Lyman Company (Inc.) by many thousands of dollars. Other terms of the agreement were in dispute, as were also the purposes to be served by it. Without narrating these conflicting details, it is enough to say that the trial judge found that the account was entered into in order that The Jordan Lyman Company (Inc.) might make a profit without investing any money, and that all the directors of the defendant knew, or ought to have known, that this was an improper use of the defendant's funds. Evidence was offered to the effect that "it was a frequent occurrence in Boston brokerage offices to have a joint account whereby one person puts up the capital with another who is financially responsible under an agreement to share profits and losses. . . . No such custom could sanction the transaction herein complained of, since Jordan and Lyman were bound to give" to the defendant "the benefit of their skill and experience." "After the so called crash in the stock market in October, 1929, no attempt was made to get any additional collateral from [The] Jordan Lyman . . . [Company (Inc.)] for this joint account." There was testimony that "the first request for collateral was not made until December, when the loss of the joint account was already over $60,000 . . . . The arrangements under the joint account, whatever they were . . . or, if no agreement, the gross negligence of the directors caused" the defendant substantial losses. In May, 1930, a new agreement was entered into by the terms of which Jordan was accepted as a joint participant and The Jordan Lyman Company (Inc.) was released. "Jordan

reduced the amount of this loan by a payment" to the defendant "of $30,000. The defendant directors knew that Jordan was practically insolvent, and that the $30,000 was borrowed from the Beacon Trust Company, which had taken as collateral all of Jordan's assets. The substitution of Jordan who was financially irresponsible, and the failure to secure the guaranty of Lyman, whose father was one of the wealthiest men in Boston, were inexcusable, particularly in view of the fact that Lyman was one of the intended beneficiaries of this joint undertaking." Lyman was not personally a party to the joint account. Whatever benefit he hoped to derive from the transaction was through The Jordan Lyman Company (Inc.) of which he was a stockholder. The failure to secure the guaranty of Lyman in these circumstances can hardly be said to be inexcusable on the part of individual defendants. The trial judge found that the transactions involved in the joint account "disclosed a flagrant breach of fiduciary duty on the part of each director, all of whom approved the plan. It was a deliberate misapplication of other people's money. The failure of the directors to take proper steps to retrieve the losses of the" defendant, "I find to be actionable misconduct. I find and rule that all the individual" defendants, "with the exception of Mumford and Adams, are liable to" the defendant for the losses suffered by it through the joint account with The Jordan Lyman Company (Inc.) and later with Jordan. The trial judge also found that, when the joint account showed a loss of $60,000, and when the financial condition of The Jordan Lyman Company (Inc.) was extremely shaky, the defendant directors caused to be paid to it $81,090 for shares of class A stock. No attempt was made to claim a right of set-off. The records of the defendant show that from time to time after October, 1929, the defendant directors could have reduced the loss by the intelligent use of the right of set-off against The Jordan Lyman Company (Inc.). This last finding is a misconception of the right of set-off. The debt from the defendant to The Jordan Lyman Company (Inc.) for the purchase of class A shares for the defendant was due immediately.

There could be no indebtedness on the part of The Jordan Lyman Company (Inc.) to the defendant on the joint account until the account was closed. *Spaulding* v. *Backus*, 122 Mass. 553. *Wiley* v. *Bunker Hill National Bank*, 183 Mass. 495. In the findings, rulings and order for decree, the trial judge, in holding a ruling of the master erroneous, states that the whole transaction as to the joint account was "tainted with bad faith." That must be taken as a finding of fact. In the opinion of a majority of the court that finding is not supported by the evidence. "Bad faith" has been defined earlier in this opinion. That finding must be pronounced plainly wrong. The finding that the individual defendants were guilty of a "breach of fiduciary duty" and "of gross negligence" in this transaction must stand. As already pointed out earlier in this opinion, the rule of *Corsicana National Bank* v. *Johnson*, 251 U. S. 68, is not applicable in these circumstances. The evidence is rather slender on this point. No investigation whatever had been made by any of the defendants of the financial responsibility of The Jordan Lyman Company (Inc.). No statements of assets and liabilities were requested. No collateral was required. No guaranty of the account was asked for. In other respects there was some laxity of conduct by the individual defendants. There is a provision in the charter of the defendant stating as one of its authorized purposes "to join with others in any enterprise conducive to the success of the corporation on such terms and conditions as may be agreed upon." That purpose can hardly be stretched to comprise the joint account arrangement as found by the trial judge. The design of that arrangement was found to be to enable The Jordan Lyman Company (Inc.) to make profits without any investment, and not the welfare of the defendant. Under the rule already stated, as to the weight to be attributed to the findings of the trial judge who observed the witnesses in giving their testimony, this finding cannot be reversed.

The plaintiff in his testimony stated: "I am not charging the company with wrongdoing for entering into the contract, I am charging them [the individual defendants] with

losses in the joint account because they did not require security from Jordan and Lyman." That testimony by the plaintiff seemingly puts the fault of the individual defend-ants on their failure to require a contribution for the capital of the joint account, or security therefor, and hence the damages would be those which naturally flow from that failure and not those which flow from the joint account as a whole. On that footing there is strong ground for com-puting damages as did the master. He stated that the trial judge had predicated liability on the fact that The Jordan Lyman Company (Inc.) was allowed to participate in the profits of the transactions without investing any of its capi-tal, or its share of the capital necessary for the joint account. There was nothing wrong, apart from this, in the purchase by the defendant of the securities in question inasmuch as this constituted the main purpose for which it was organized. Therefore the master ruled that the damages assessable against the individual defendants were one half the losses sustained as a result of the purchases on the joint account. Whether the defendant would have entered into this series of transactions entirely on its own account, cannot be deter-mined. In fact, the whole series was on the joint account. The damages are assessable in accordance with that fact. The defendant directors are liable for the entire loss sus-tained by the defendant on this account. Although the accounts have never been closed, the transactions for which the several defendants are responsible are those entered upon before the dates when the several defendants ceased to be directors, but the damages resulting from such trans-actions must be assessed as of the date of the final hearing as to the determination of the facts. The value of the stocks in the joint account must be ascertained as of the date of such final hearing and the losses computed accordingly. It appears that the defendant Gow ceased to be a director on March 16, 1932, and the defendants Jopp, Lawler, Poole, Hart and Sturges on July 25, 1932. The defendants con-tend that because the joint account has never been closed there can be no determination of damages. That conten-tion cannot be supported.

The defendant Lyman is still a director. The master, after finding the stocks still held by the defendant on the joint account, stated it to be his opinion that either these stocks must be disposed of or Lyman must resign as a director before the loss sustained by the defendant on the joint account could be measured as against him, and that, if he was in error on this point, there was no evidence before him as to the value of the stocks either on the date when the suit was commenced or on the date of his findings. He made a finding as of the date of the hearing. The rule of damages adopted by the master cannot be followed. The Jordan Lyman Company (Inc.) has been released from liability on the joint account. We think that damages should be assessed as of the date of the final hearing as to determination of the facts, and that all available data may be considered in ascertaining the amount of the loss. This is common practice in equity. *Bauer* v. *International Waste Co.* 201 Mass. 197, 203. *Day* v. *Mills*, 213 Mass. 585, 587. *Ensign* v. *Faxon*, 229 Mass. 231, 233.

The account should be stated on this branch of the case according to general principles of gain and loss. Interest may be charged on the sums paid out on the joint account, and the individual defendants are entitled by way of salvage to credit for any sums realized from stocks which may have been sold, the present market value of stocks remaining unsold, dividends received on stocks and the payment made by Jordan by way of reduction on the account. Paragraph II of the final decree must be struck out. There must be a further hearing, either before the court or before a master, to determine the damages to be embodied in a new decree on this branch of the case.

The trial judge found that the financial statements of the defendant "show that dividends were paid out of capital for the year 1929, up to and including the first quarter of the year 1932" and "that all the directors knew or ought to have known that they were impairing the capital" of the defendant by the payment of these dividends. It is earnestly argued in behalf of the defendants that there was error in reaching these findings. They are, however,

accepted as true for the purposes of this decision without further discussion and this point is treated on that footing. It was found by the trial judge that "it is hardly necessary to state that the rights of creditors were in no way prejudiced by the actions of the directors complained of by the stockholders with reference to the note, the joint account, the payment of dividends and the purchase of" class A stock.  There is no dispute that the dividends in question were paid to and retained by the stockholders.

It is a general principle that ordinarily dividends cannot rightly be paid out of capital but can be paid only out of profits.  *Fernald* v. *Frank Ridlon Co.* 246 Mass. 64, 74. *Willson* v. *Laconia Car Co.* 275 Mass. 435, 441.  *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 157.  *Davenport* v. *Lines*, 72 Conn. 118.  *Dovey* v. *Cory*, [1901] A. C. 477, 487.  When the rights of creditors have been affected by such unwarranted payment of dividends, recovery generally may be had of the directors through whose fault such dividends have been paid.  Suits of that nature by trustees in bankruptcy or official liquidators are not infrequent. *Loan Society of Philadelphia* v. *Eavenson*, 248 Penn. St. 407. *In re National Funds Assurance Co.* 10 Ch. D. 118.  The subject is regulated by statute in some jurisdictions.  *Appleton* v. *American Malting Co.* 20 Dick. (N. J.) 375.  *Wesp* v. *Muckle*, 136 App. Div. (N. Y.) 241, affirmed in 201 N. Y. 527.  There is no statute governing the matter in this Commonwealth.  It has been found that the defendant was not insolvent and the money sought to be here recovered is not needed to pay creditors.  The principles of the common law are controlling.  In *Digney* v. *Blanchard*, 226 Mass. 335, it appeared that the trustee of an unincorporated association (which issued certificates similar to shares of stock in a corporation) had distributed among its certificate holders considerable sums as dividends in bad faith and with gross negligence.  A receiver in the name of the association sought to recover from the trustee the dividends so paid.  The unincorporated association was not insolvent and the money was not needed to pay its creditors. It was held that there could be no recovery because there

was no ground in law for compelling the defendant to repay to the association the amount of dividends already ratably distributed to and retained by the certificate holders. This decision controls this aspect of the case at bar. In Emerson v. *Gaither*, 103 Md. 564, 581, it was said that, if the money were not needed to pay creditors, a receiver of a corporation "should not be permitted to recover for the benefit of the stockholders by reason of the declaration of dividends, inasmuch as the stockholders themselves received the dividends and should not be permitted to hold the directors responsible for them." In *Siegman* v. *Maloney*, 18 Dick. (N. J.) 422, 428–429, it was said in a suit by stockholders in behalf of a corporation to recover from directors dividends illegally paid: "The payment into the treasury of the company of the amount of these illegal dividends will inure directly to the benefit of the stockholders, who are the very persons who have received the money. This . . . would be highly inequitable and unjust." The force of this reasoning is not affected by the fact that that decision was overruled in *Appleton* v. *American Malting Co.* 20 Dick. (N. J.) 375, on the ground that there had been misinterpretation of the governing statute which contained stringent provisions. This latter decision has been much relaxed by a subsequent statute discussed in *Fleisher* v. *West Jersey Securities Co.* 84 N. J. Eq. 55. In *Turquand* v. *Marshall*, L. R. 4 Ch. 376, 382, it was said that to ask that directors be made liable for all money paid away improperly in dividends "was a very singular claim, as, in fact, it was asking the directors to pay over again to the shareholders what they had already received as dividends." The weight of authority supports this view. *Wallace* v. *Lincoln Savings Bank*, 89 Tenn. 630, 641. *Scott's Executors* v. *Young*, 231 Ky. 577, 583, 584. *Hochman* v. *Mortgage Finance Corp.* 289 Penn. St. 260, 266, 267. *Hutchinson* v. *Stadler*, 85 App. Div. (N. Y.) 424, 430, 431. *De Raismes* v. *United States Lithograph Co.* 161 App. Div. (N. Y.) 781, 784. See also *Verner* v. *General & Commercial Investment Trust*, [1894] 2 Ch. 239. Decisions like *In re Exchange Banking Co.* 21 Ch. D. 519, are quite distin-

guishable because they were proceedings by official liquidators and the money sought to be recovered was needed to pay creditors.

The conclusion is that there can be no recovery from the defendant directors for dividends paid to and retained by the stockholders. Paragraph III of the final decree ordering payment for such dividends must be struck out.

The fourth ground of liability urged against the defendant directors relates to the purchase of fifty-four thousand, three hundred ninety-six shares of class A stock for which $757,673.46 was paid, chiefly out of capital in the treasury of the defendant. The trial judge stated that he was "unable to find on the evidence to what extent, if any," the defendant paid more than the market price for class A stock. He found that the price paid was the average price paid by the brokerage house which made the purchases for the defendant. The master found that the defendant did not pay anything in excess of the market price for the stock. It is manifest that the defendant did not pay excessive prices for the purchase of any substantial amount of this stock. It was not shown and there was no finding that the prices paid were above the liquidating value of the remaining shares of the same class. The shares thus purchased were not retired or cancelled but have remained in the treasury of the defendant. By express provision of the organic law of the defendant it was authorized to purchase shares of its own stock. Shares so purchased "shall not be deemed a reduction of its capital stock." Such purchases were not forbidden by law. It has long been settled in this Commonwealth that a domestic corporation may purchase its own stock, even without agreement to that effect in its organic law. A contract for a corporation to purchase its own stock when surplus is not available for the purpose is not *ultra vires* or inherently unenforceable on any other ground. *Barrett* v. *W. A. Webster Lumber Co.* 275 Mass. 302, 307, and cases cited. *Crimmins & Peirce Co.* v. *Kidder Peabody Acceptance Corp.* 282 Mass. 367, 376. *Scriggins* v. *Thomas Dalby Co.* 290 Mass. 414. *Crowell & Thurlow Steamship Co.* v. *Crowell,* 280 Mass. 343,

350. *Dupee* v. *Boston Water Power Co.* 114 Mass. 37. The trial judge stated that he was unable to believe the explanations offered by the defendant directors for making these purchases. He stated also that the "reckless expenditure" of money for the purchase of class A stock "practically cleaned out the treasury," that money was borrowed to make some of the purchases, that the stockholders were unaware of these "wholesale purchases" and that they were clearly discriminated against, that by reason of these purchases the Beacon Trust Company and later its successor, The Atlantic National Bank of Boston, remained in complete control of the defendant, and that the result of these purchases was entirely at variance with the spirit of G. L. c. 156, § 45, as to reduction of capital stock. He further found that these purchases of shares caused a direct loss to the remaining class A stockholders because the money available for liquidation was distributed unequally. At no time in the case at bar had the defendant enough funds to assure the payment to the class A stockholders of the $20 per share to which they were entitled on liquidation. He found also that these shares were purchased without any reference to the welfare of the defendant and that the result of the transactions was to prejudice the rights of holders of class A stock who kept their shares, and to prevent them from acquiring voting power to which they might be entitled under the by-laws.

These purchases did not in fact result in a reduction of capital stock, for the stock was kept in existence, ready to be sold and transferred. *Leonard* v. *Draper*, 187 Mass. 536, 538. *Dustin* v. *Randall Faichney Corp.* 263 Mass. 99, 103. *Dupee* v. *Boston Water Power Co.* 114 Mass. 37, 43. It may be sold and reissued whenever business conditions warrant. The trial judge thought it hardly necessary to state that the rights of creditors were in no way prejudiced by the actions of the directors with reference to the note, the joint account, the payment of dividends, and the purchase of class A stock. Creditors have not been harmed. The owners of class A stock who sold their holdings do not appear to have been injured. Apart from

that fact, even if harmed, their damages could not be recovered in this suit.   The provision permitting holders of class A stock to vote, if dividends were not paid as required, was for the protection of the rights of such holders to dividends.   If the purchase of stock preserved their rights to dividends, as it plainly did, it hardly can be a wrong to them.   The trial judge found that these purchases rendered it easier for the defendant to pay dividends on the outstanding stock.   If it did, they have not lost the right to vote.   It has not been argued that these purchases harmed the holder of class B stock and of common stock.

It is argued that the individual defendants were acting for the benefit of the bank in purchasing the stock, and thus serving two masters and not the defendant alone.   It is to be observed that the bank was the owner of all the common stock and all the class B stock.   It was the duty of the individual defendants who were directors of the defendant to manage the defendant for the benefit of the bank as such stockholder, as well as for the benefit of the holders of class A stock.   The bank as holder of common stock was entitled not to be discriminated against.   The defendant directors had a right, if not an obligation, to take into account the welfare of the holders of the common stock, as well as that of holders of other classes of stock.   This is not a case where the directors were managing a corporation for the benefit of outsiders.   The circumstance that it was in the minds of the defendant directors that control of the defendant might remain in the hands of the bank and its successor does not vitiate their conduct not harmful in other particulars.

No provision of law required the directors, in making these purchases of stock to hold and not to retire, to buy them ratably from the stockholders.   *Downs* v. *Jersey Central Power & Light Co.* 115 N. J. Eq. 448, 451.   There is no finding that any intention exists to retire the stock in question.   No presumption to that end can be indulged.   *City Bank of Columbus* v. *Bruce,* 17 N. Y. 507, 512.   It appears to be established that the purchases of stock were at prices not in excess of the market value of the class A stock and

were below the prices at which the stock sold at the outset. Such purchases enured to the benefit of the holders of the remaining class A stock.

It is plain that the individual defendants violated no law in purchasing for the defendant shares of its own stock. The circumstance that the trial judge did not believe the testimony of the individual defendants was not proof that their motive was corrupt or that the opposite of their testimony was the truth.    *De Blois* v. *Boylston & Tremont Corp.* 281 Mass. 498, 518.    *Wakefield* v. *American Surety Co.* 209 Mass. 173, 177.    There was no illegality in the method followed by the individual defendants and no discrimination between stockholders in making these purchases. *British & American Trustee & Finance Corp. Ltd. & Reduced* v. *Couper,* [1894] A. C. 399, 413, 415, 416.    The finding that these purchases caused a loss to the remaining holders of class A stock was plainly wrong.    The necessary result of these purchases was to benefit such remaining shareholders because it increased the liquidating value of their shares.    It increased the proportionate share of assets allocable to each remaining share.    There is nothing in the record to indicate that the decline in the assets of the defendant was due to these purchases rather than to the effect of the great depression in the values of securities. Decline in values due to the depression was nothing which the defendant directors could have foreseen or for which they were responsible.    *Creed* v. *McAleer,* 275 Mass. 353, 358.    *First National Bank of Boston* v. *Truesdale Hospital,* 288 Mass. 35, 46.

More than half of the total number of shares of class A stock were purchased by the defendant.    It is argued that the expenditure of the large sums of money for the purchase of stock had the effect of reducing the resources available for the legitimate business of the corporation.    There is no finding that the defendant was deprived, because of these purchases, of funds which, for the best interests of the defendant, should have been used to carry on its ordinary business of buying and selling stocks and other investments.    That kind of business was highly speculative

during the period from 1929 to 1932, when the purchases of class A stock were made. That is shown by schedules in the record of stocks already bought by the defendant. It is matter of common knowledge. It cannot be pronounced actionable breach of duty of the defendant directors to refrain from taking further risks. By purchasing these shares the defendant was relieved of a cumulative obligation to pay dividends on them. By purchasing this stock the directors of the defendant were in a position to gain on a rising market, which would be reflected in the value of that stock, and at the same time reduce the liabilities of the defendant if the stock did not rise. If no person interested in the defendant was wronged by the purchase of this stock, it is difficult to see how the defendant was injured as a corporation by the limitation of its investment operations in a period when such operations would be likely to be as hazardous as was the purchase of stock in the defendant itself. *Barrett* v. *W. A. Webster Lumber Co.* 275 Mass. 302. *Scriggins* v. *Thomas Dalby Co.* 290 Mass. 414.

This whole question of acquisition of shares of stock in the defendant itself was a matter within the control of the directors of the defendant in the exercise of their sound judgment. The management of the affairs of the defendant was vested in its board of directors, who are not responsible for mere errors of judgment or want of prudence. It is no part of the judicial function to substitute its business view for that of those vested by law with the control of corporate affairs. Courts intervene only when a breach of fiduciary obligation is shown. *Sagalyn* v. *Meekins, Packard & Wheat Inc.* 290 Mass. 434.

The facts found on this branch of the case fail to show breach of fiduciary duty on the part of the defendant directors. Purchase of shares of its own stock by the defendant was clearly within its corporate powers. The amount which ought to be bought was to be determined by the directors of the defendant. The prices paid are not open to criticism. It does not appear on analysis of the findings that anybody suffered legal harm. The period was in the

midst of the great depression.  The result is that there
is no sound ground for holding the individual defendants
liable on this branch of the case.  It follows that para-
graph IV must be struck out of the final decree. .

It is argued in behalf of some of the individual defendants
that the plaintiff cannot rightly be said to have maintained
his right to prosecute this suit in behalf of the defendant.
The governing principle of law in this respect was stated
in *Dunphy* v. *Traveller Newspaper Association,* 146 Mass.
495, 497, 498, to the effect that ordinarily a single share-
holder cannot launch a corporation in litigation for relief for
a wrong alleged to have been done it, but must "first seek
his remedy within the corporation.  The only exception to
the rule that a stockholder must apply to the directors,
and also if need be to the corporation, for redress of a
wrong done it, before he can sue in a court of equity, for
himself and in behalf of other stockholders, is when it
appears that such application would be unavailing to pro-
tect his rights. . . . That may happen when the directors
themselves are the wrongdoers, or are in fraudulent com-
bination with them, or when the corporation is controlled
by them . . . ."  The allegations of the present bill are
rather slender in this particular.  *Bartlett* v. *New York,
New Haven & Hartford Railroad,* 221 Mass. 530.  *Hayden*
v. *Perfection Cooler Co.* 227 Mass. 589.  But there was no
demurrer.  The defendants answered.  The case went to
trial on this among other issues.  The finding of the trial
judge was in favor of the plaintiff.  He asserted in his
findings and rulings filed on July 6, 1933, that the indi-
vidual defendants stated that they desired the plea in bar
overruled.  In these circumstances, we think that the pre-
liminary question of the right of the plaintiff to prosecute
this suit was abandoned and cannot be revived at this stage.

There has been no contention that there is error in para-
graphs V and VI of the final decree.  Since no liability is
established against the defendant Mumford he should be
omitted from paragraph V and included in paragraph VI.
As thus modified the substance of those paragraphs may
be in a new final decree.

Many other questions have been discussed in argument. But the salient contentions have been considered and determined. It is not necessary to consider in detail the objections to the master's report.

The result is that the final decree is reversed and the case is to stand for further proceedings in conformity to this opinion.

*Ordered accordingly.*