**RESOLUTION TRUST CORPORATION, as Receiver of Home Federal Savings Bank of Worcester, Plaintiffs,**

v.

**Sumner GLADSTONE, Anthony Delapa, A. James Derderian, Alfred L. Gladstone, and Charles H. Turner, III, Defendants.**

Civ. A. No. 93–11255–NG.

United States District Court,
D. Massachusetts.

July 18, 1995.

Marc K. Temin, Foley, Hoag & Eliot, Kevin F. Moloney, Barron & Stadfeld, Boston, MA, for Resolution Trust Corporation.

Richard J. Grahn, Looney & Grossman, Nancy L. Brush, Albert F. Cullen, Jr., Cullen & Butters, Boston, MA, Edward T. Robinson, Michael Consentino, Seegel & Lipshutz, Wellesley, MA, for Sumner Gladstone, Alfred L. Gladstone.

Richard J. Grahn, Looney & Grossman, Boston, MA, Charles J. Cooper, Vincent J. Colatriano, Shaw, Pittman, Potts & Trowbridge, Washington, DC, Albert F. Cullen, Jr., Cullen & Butters, Arlene B. Marcus, Lemelman & Lemelman, John C. Englander, Goodwin, Proctor & Hoar, Boston, MA, for Anthony F. Delapa.

Richard J. Grahn, Stewart F. Grossman, Looney & Grossman, Boston, MA, Albert F. Cullen, Jr., Cullen & Butters, for A. James Derderian.

Richard J. Grahn, Looney & Grossman, Gabriel O. Dumont, Jr., Dumont and Morris, Boston, MA, Albert F. Cullen, Jr., Cullen & Butters, Boston, MA, for Charles H. Turner, III.

Stephen C. Reilly, Hale & Dorr, Boston, MA, for David Ean Coleridge.

Henry Frenette, Wheatley, Frenette & Dukess, Brockton, MA, for Charles N. Fuller.

Michael P. Angelini, Bowditch & Dewey, Worcester, MA, for Edward L. Clifford.

## MEMORANDUM AND DECISION

GERTNER, District Judge.

### I. INTRODUCTION

The central question in this case is what level of culpability must the Resolution Trust Corporation establish in order to recover damages against former directors and officers of a federally chartered savings and loan institution. This question in turn, requires a determination of whether federal statutory law, federal common law or state common law provides the appropriate standard. The parties to this conflict are the Resolution Trust Corporation ("RTC") and former directors and officers of Home Federal Savings Bank of Worcester ("Home Federal").

The Complaint alleges that: (1) the defendants breached their duty as fiduciaries of Home Federal (Count I); (2) the defendants were negligent per se (Count II) and grossly negligent (Count III) in their management of the bank; (3) that Defendant Sumner Gladstone breached his fiduciary duty of loyalty to Home Federal (Count IV); and (4) that Defendant Sumner Gladstone made misrepresentations to the Home Federal Board of Directors (Count V). Specifically, the defendants are charged with approving speculative commercial real estate loans without adequately considering the risk of loss associated with each borrower. In addition, Sumner Gladstone is accused of breaching his fiduciary duty of loyalty by engaging in conduct which benefitted him personally at the expense of Home Federal, such as approving loans to individuals in exchange for cash payments.

Each defendant has moved for summary judgment arguing: (1) that section 1821(k) of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") (codified

12 U.S.C. § 1821(k)) bars the RTC from maintaining a claim for relief against former directors and officers for merely negligent conduct; (2) that since no material issue of fact exists regarding the defendants' grossly negligent behavior, judgment can be entered for defendants as a matter of law; and (3) that the RTC's claims are barred by the statute of limitations. For the reasons stated herein, the defendants' motions are **ALLOWED** in part and **DENIED** in part.

## II. SUMMARY OF FACTS

Home Federal was a savings and loan institution located in Worcester, Massachusetts. Although originally created as a state-chartered cooperative bank in 1947, Home Federal received a federal mutual savings and loan charter on December 31, 1965. Since that time, Home Federal operated under the supervision of the Federal Home Loan Bank Board ("FHLBB"). In 1985, defendants Derderian, Delapa and Sumner Gladstone, formed American Heritage Bancorp ("AHB") for the purpose of acquiring Home Federal. Initially, defendants Sumner Gladstone, Delapa and Derderian each owned one third of AHB's stock.

On June 14, 1985, Home Federal entered into an agreement under which it became a wholly owned subsidiary of AHB. The agreement was ratified by Home Federal's stockholders on November 8, 1985. Since Home Federal was under the supervision of federal regulators, the merger transaction had to be approved by the Federal Savings and Loan Insurance Corporation ("FSLIC").[1] At the time of the transaction, Home Federal was failing its federal regulatory capital re-quirements. Accordingly, the FSLIC conditioned its approval of the transaction on AHB's (1) infusion of capital into Home Federal; and (2) its agreement to maintain Home Federal's net worth at a certain level. On June 9, 1986, Sumner Gladstone,[2] Delapa[3] and Derderian[4] were appointed to Home Federal's Board of Directors. Defendant Alfred Gladstone joined the Board as a director of Home Federal on June 25, 1987.[5] In June, 1987, Defendant Turner became Home Federal's chief loan officer.

Shortly after the defendants joined the Board of Directors, Home Federal sold its portfolio of single family fixed rate loans. In place of these loans, the bank embarked on a program of making commercial real estate loans. According to the FHLBB report dated September 30, 1986, Home Federal's commercial real estate loan portfolio, which totalled $75,000,000, represented 26% of the total assets of the bank.

The FHLBB's September 1986 report also noted deficiencies in Home Federal's commercial lending practices, including the failure to obtain adequate pre-loan appraisal reports. The FHLBB forwarded its report to Home Federal on January 27, 1987, along with a letter that highlighted its conclusions. The FHLBB specifically asked Home Federal's Board to "outline the steps taken to ensure that appraisal reports were prepared in conformance with FHLBB Memorandum R41c and that loan proceeds were not disbursed prior to the receipt of a fully documented appraisal report."[6]

In a letter dated March 26, 1987, defendant Sumner Gladstone, as President of

---

1. The FSLIC, which was responsible for insuring the depository accounts of eligible institutions, was run under the direction of FHLBB. FIRREA dismantled and replaced both federal agencies with the Office of Thrift Supervision.

2. Sumner Gladstone served as director of Home Federal from June 9, 1986 through April 28, 1988, and its President and Chief Executive Officer from December 1, 1986 through April 28, 1988.

3. Delapa served as a director of Home Federal from June 9, 1986 through June 8, 1990 and its President and Chief Executive Officer from April 28, 1988 through June 8, 1990.

4. Derderian served as a director of Home Federal from June 6, 1986 through June 8, 1990 and its Chairman of the Board of Directors from April 28, 1988 through June 8, 1990.

5. Alfred Gladstone served through December 15, 1989, and served as a member of the Bank's Executive Committee beginning in 1988.

6. Memorandum R41c contains guidelines for the maintenance of certain loan files to facilitate the Board's audit process. See Section VI(C)(1) infra.

Home Federal, responded to the FHLBB's concerns. The letter explained Home Federal's increased commercial real estate lending activity as necessary to insure that the Bank would receive an adequate return on its investment. Gladstone assured the FHLBB that:

> the underwriting policies that will be followed for all commercial loans will be of the highest standards and we recognize a sound appraisal report as a critical element of the underwriting process. We have established an internal review of all our commercial loans and require that each commercial loan be approved by our Executive Committee.

Exhibit 4 to Second Affidavit of Rinaldi at R31368.

Despite Gladstone's assurances to the FHLBB, the RTC alleges that the defendants failed to follow both Home Federal's own procedures regarding commercial real estate lending, and the record keeping requirements contained in FHLBB Memorandum R41c.

In addition, Sumner Gladstone is singled out by the RTC for approving loans from which he personally benefitted.

### A. Conduct By Sumner Gladstone

Sumner Gladstone, it is alleged, engaged in certain "interested" transactions (described below) without first disclosing to the Home Federal Board of Directors either his personal gains or his business relationship to the borrowers.

#### 1. The Forrest Sell Loan

According to Forrest Sell, a New Hampshire real estate developer, Sumner Gladstone personally made loan commitments to him in return for Sell paying Gladstone a total of $50,000. Deposition of Forrest Sell at pp. 24–27. Sell testified that Gladstone went so far as to refuse to forward the necessary closing documents when Sell refused to make the final payment. Deposition of Forrest Sell at pp. 24–27. The RTC maintains that Gladstone's demand for kickbacks in consideration of loan commitments violated his duty of loyalty as a fiduciary.

#### 2. The Albert Winnier Loan

The RTC also alleges that Gladstone failed to make certain disclosures to the Home Federal board of directors prior to extending a $6,000,000 loan to another developer, Albert J. Winnier on August 27, 1987. According to Winnier's deposition, Gladstone approached him regarding a real estate development in Florida known as Frenchmen's Creek. Winnier testified that Gladstone asked him to buy the property and develop it, at which point Gladstone would repurchase the development from him. Deposition of Albert Winnier at p. 15. Gladstone assured him that "he [Gladstone] would guarantee ... the loan to purchase and it wouldn't cost me one dollar out of my pocket," and that when Gladstone repurchased the completed project, "[w]e would have a fee of $200,000 in there above the cost." *Id.* The RTC argues that Gladstone breached his duty of loyalty to Home Federal by not disclosing the arrangement with Winnier prior to Home Federal approving the loan.

#### 3. The Roger Bouchard Loan

According to the deposition of Roger E. Bouchard, a New Hampshire real estate developer, Gladstone caused Home Federal to loan $1.12 million to two individuals for the purpose of developing a residential subdivision in Manchester and Hooksett, New Hampshire. Gladstone failed to disclose to the Board that he and his son served as trustees of Lakeview Realty Trust which owned land abutting the proposed development site and would obviously benefit from the Bouchard development loan. The RTC claims that as a fiduciary, Gladstone had an obligation to disclose his interest in the adjoining property prior to the board approving the Bouchard loan.

### B. The Remaining Defendants

The remaining defendants, it is alleged, breached their duty of care by failing (1) to adhere to Home Federal's internal lending policies and (2) to adhere to the requirements of Memorandum R41c prior to approving 19 loans which eventually defaulted. The internal lending policy required the members of the bank's Executive Committee to ratify all loans approved by the Bank between $500,-

000 and $2,000,000, and to directly approve all loans in excess of $2,000,000. According to the minutes of the Executive Committee, that policy was ignored by the defendants. Rinaldi Second Affidavit Exhibit A–1 at R–51829 through A–2 at R–51660, and Exhibits B–1–18. Indeed, the RTC alleges that the bank failed precisely because of the defendants' conduct in these areas

## III. THE SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where all of the relevant pleadings, viewed in the light most favorable to the non moving party, present no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Alan Corp. v. International Surplus Lines Insurance Co.*, 22 F.3d 339, 342 (1st Cir.1994); *Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990).

## IV. THE INTERNAL AFFAIRS DOCTRINE AND THE APPLICABILITY OF FEDERAL LAW

Because Count I and II of the complaint allege claims under either state or federal common law, I must first determine what law to apply. The defendants argue that Home Federal, as a federally chartered thrift under comprehensive federal regulatory supervision, should be subject exclusively to federal law standards of fiduciary duty. The RTC counters that the defendants can be held liable under both federal and state common law theories.

I am persuaded by the defendants' argument for two fundamental reasons: (1) the federal government's significant interest in uniformity in the regulation of federally chartered savings and loans; and (2) the uncertainty that would result in applying state law

to federally chartered institutions that engage in interstate banking.

### A. Standards Governing the Application of Federal Common Law

In *Erie Railroad Co. v. Tompkins*, the Supreme Court determined that there is no longer "a federal general common law." 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Nevertheless, the Supreme Court "has recognized the need and authority in some limited areas to formulate what has come to be known as federal common law." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981) (internal citations omitted). There are two situations which warrant the application of federal common law: (1) where application of state law would jeopardize "uniquely federal interests" and (2) where Congress has "given the courts the power to develop substantive law." *Id.* The administration of federally chartered savings and loan institutions satisfies the criteria enunciated in the first exception.

In *Fidelity Federal Saving and Loan Ass'n. v. de la Cuesta*, 458 U.S. 141, 166, 102 S.Ct. 3014, 3029, 73 L.Ed.2d 664 (1982) the Court recognized that Congress "delegated to the [Federal Home Loan Bank] Board broad authority to establish and regulate a uniform system of savings and loan institutions where there are not any now and to establish them with the force of the government behind them, with a national charter." (internal quotations omitted). Moreover, the Court in *de la Cuesta* unequivocally stated "Congress plainly envisioned that federal savings and loans would be governed by what the Board—not any particular State— deemed to be the best practices." *Id.* at 161 (holding that FHLBB regulations barred the application of contrary state law).[7]

There is a significant interest in having a uniform standard of liability govern the conduct of directors and officers of federally

---

7. As one court noted, "In keeping with this broad regulatory mandate, the Office of Thrift Supervision has been given the 'plenary and exclusive authority ... to regulate all aspects of the operations of Federal savings associations ...' When that authority is exercised, it is 'preemptive of any state law purporting to address the subject of the operations of a federal savings associations.'" *RTC v. Hess*, 820 F.Supp. 1359, 1362 (D.Utah 1993) (*quoting* 12 CFR § 545.2 (1992)).

chartered, federally insured, savings and loan institutions. As one court noted, "[a]llowing a diversified array of state laws governing director liability to apply to federal associations would result in a system of conflicting standards of conduct which would interfere with the congressional mandate of uniformity." *RTC v. Hess*, 820 F.Supp. at 1369 (recognizing the applicability of federal common law to *federally* chartered institutions). Likewise, in *Eureka Federal Sav. and Loan Ass'n. v. Kidwell*, 672 F.Supp. 436 (N.D.Cal. 1987) the court stated:

> In light of the overwhelming preponderance of federal law, federal legislation, and unique federal interests implicated in the internal administration of the federal savings and loan associations, Eureka's causes of action alleging breach of fiduciary duties by defendants will be governed by federal common law.

*Id.* at 441. *See also, City Federal Savings and Loan Ass'n. v. Crowley*, 393 F.Supp. 644, 654 (E.D.Wis.1975); *Rettig v. Arlington Heights Federal Savings and Loan Ass'n.*, 405 F.Supp. 819, 827 (N.D.Ill.1975) (finding administration of federally chartered thrifts a unique interest worthy of federal common law); *contra AmeriFirst Bank v. Bomar*, 757 F.Supp. 1365, 1373 (S.D.Fla.1991) (refusing to apply federal common law to breach of fiduciary duty claim); *First Hawaiian Bank v. Alexander*, 558 F.Supp. 1128, 1132 (D.Hawaii 1983) (same).

**B.** *The Internal Affairs Doctrine and Interstate Banking*

■ In addition to the federal government's interest in uniformity, the internal affairs doctrine,[8] which creates a presumption that the law of the chartering jurisdiction should be applied to disputes stemming from the internal administration of a corporation, supports the application of federal law. *RTC v. Chapman*, 29 F.3d 1120, 1122 (7th Cir.1994) (citing *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 8–93, 107 S.Ct. 1637, 1649–52, 95 L.Ed.2d 67 (1987) (holding that law to be applied to corporate

affairs is the law of the state of incorporation)); *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983); *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982). The purpose of the doctrine is to make certain that directors and officers whose firm may do business in many states are not subject to conflicting obligations. *Edgar*, 457 U.S. at 645, 102 S.Ct. at 2642; *see* Restatement (2d) of Conflict of Laws § 302 (1971). Since Home Federal maintained a federal charter, federal law presumptively applies to this suit.

■ The presumption associated with the internal affairs doctrine can be overcome: (1) if the expectations of the parties involved merit the application of other law; (2) in the name of "certainty"; or (3) if the "ease in the determination and application of the law to be applied" justify the use of another jurisdiction's law. *RTC v. Everhart*, 37 F.3d 151, 153 (4th Cir.1994).

■ With respect to the first prong, the expectations of the parties, given the scrutiny federal regulators exercised throughout Home Federal's existence, it is reasonable to assume that the parties involved would anticipate the application of federal law to the internal affairs of the bank. Home Federal has been directly supervised by federal regulators since 1965. The FHLBB repeatedly reviewed the bank's loan portfolio and made recommendations regarding risk and capital reserve allocation. Literally, Home Federal was subjected to federal regulation "from its cradle to its corporate grave." *Fidelity Federal Savings and Loan Ass'n. v. de la Cuesta*, 458 U.S. 141, 144, 102 S.Ct. 3014, 3018, 73 L.Ed.2d 664 (1982) (quoting *People v. Coast Federal Sav. & Loan Assn.*, 98 F.Supp. 311, 316 (S.D.Cal.1951)).

Finally, the "certainty" and "ease in determination" of the law to be applied standards are also met by the application of federal law. In 1982, when Massachusetts became an in-

---

**8.** The Supreme Court defined the doctrine as a "principle of conflict of laws ... designed to make sure that the law of only one state shall govern the internal affairs of a corporation or

other association." *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 89–90, 107 S.Ct. 1637, 1649–50, 95 L.Ed.2d 67 (1987).

terstate banking jurisdiction, the application of state law became problematic. If a federally chartered thrift did business in all five New England states, which state law would govern the duty a director or officer owes to depositors? How would depositors, or more importantly the directors themselves, know which state's standard of care is applicable? As the *Chapman* court stated:

> Multi-state and inter-state banking were rare until the 1980s. Illinois was a unit banking state; no bank doing business in Illinois could have branches. It is therefore not surprising that some Illinois courts treated a bank's place of incorporation as irrelevant; to do business in Illinois was to be "an Illinois bank" without regard to the difference between federal and state incorporation. All of that has changed, however. Illinois now allows multi-state operations, and throughout the state one may find offices of financial institutions incorporated elsewhere. [The failed bank at issue here] was itself a multi-state institution, with branches in North Dakota as well as Illinois. The advent of inter-state banking puts the choice of law question in focus and leads us to apply the internal affairs doctrine to this case. [This bank] held a federal charter, so national law governs the liability of officers and directors for their management.

*Id.* at 1123 (internal citations omitted).

In sum, the existence of a federal charter acts as a contract between the depositors of the thrift and its directors and officers. See

Roberta Romano, *Competition for Corporate Charters and a Lesson for Takeover Statutes,* 61 Fordham L.Rev. 843 (1993) (describing the effect of a jurisdiction's corporate law on a corporate charter). Just as the law of the state of incorporation resolves issues relating to the internal affairs of a state chartered corporation, *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 89–93, 107 S.Ct. 1637, 1649–1652, 95 L.Ed.2d 67 (1987), so federal law controls the internal affairs of a federally chartered savings and loan association.[9]

The RTC disagrees, citing to several district court cases where state law claims against federally chartered thrifts were held actionable.[10] *See RTC v. Gibson,* 829 F.Supp. 1103, 1109 (W.D.Mo.1993); *FSLIC v. Shelton,* 789 F.Supp. 1367, 1369–70 (M.D.La. 1992); *FDIC v. Barham,* 794 F.Supp. 187, 191 (W.D.La.1991); *Curiale v. Reissman,* 798 F.Supp. 141 (S.D.N.Y.1992). Each one of those decisions is distinguishable. The first three decisions, *Gibson, Shelton,* and *Barham* never addressed the unique federal interest in the administration of federally chartered savings and loan associations. In *Curiale,* the court considered whether federal subject matter jurisdiction existed over a claim by private note-holders against bank directors. Unlike the present case where an independent basis for federal jurisdiction exists (the RTC's status as plaintiff), the *Curiale* court refused to construe a general contract "action on a note" as a claim arising under federal common law. In any event, to the extent that the *Curiale* court denies the

---

9. Judge Easterbrook put it succinctly in *RTC v. Chapman,* 29 F.3d 1120, 1121 (7th Cir.1994):

> This is ... a suit by a federal agency invoking federal jurisdiction.... Federal law may well look to state law for substantive principles but which law to select is itself a question of federal law.... If the question before us were whether [the bank] could establish a new branch, whether it could redecorate a building designated an historic landmark, or when funds escheat after depositors vanish, [state law] would control.... To the extent the RTC acts as receiver, it inherits the corporation's claims against the directors and officers, so the internal affairs doctrine applies normally. The RTC gets no more rights than the firm itself had. To the extent the RTC depicts itself as a third party—more like a victim of a tort than like a firm seeking to hold its managers ac-

countable for the benefit of investors—that serves only to put the case squarely in the realm of federal law.

*Id.* at 1124.

After determining that federal law governed the internal affairs of a federally chartered thrift, the *Chapman* court found that 12 U.S.C. § 1821(k) preempted federal common law, a conclusion with which I disagree. *See infra* Section V.

10. In *RTC v. Shuck,* 1995 WL 170137 (D.Mass. 1995), the court concluded that 12 U.S.C. § 1821(k) did not preempt state common law, but did preempt federal common law. For the reasons described above, this Court comes to a different conclusion.

efficacy of federal common law as a basis of federal jurisdiction, I respectfully disagree.

I choose to follow the courts that conclude that federal common law is appropriately applied to federally chartered institutions. *RTC v. Cityfed Financial Corp.,* 57 F.3d 1231, 1246–1249 (3rd Cir.1995); *FDIC v. McSweeney,* 976 F.2d 532, 538 (9th Cir.1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 2440, 124 L.Ed.2d 658 (1993); *RTC v. Hess,* 820 F.Supp. 1359, 1362 (D.Utah 1993); *FDIC v. Nihiser,* 799 F.Supp. 904, 907 (C.D.Ill.1992); *FDIC v. Fay,* 779 F.Supp. 66, 67 (S.D.Tex. 1991). Due to the unique relationship between federal regulators and federally chartered thrifts (which continues to exist after FIRREA), *see* Wells, *FIRREA, State Law, and the Federal Financial Director's Duty of Care,* 13 Ann.Rev.Banking L. 395, 407–517 (1994), and the confusion that would result in the application of state law to a federally chartered institution, I find that the standard of care of directors and officers of a federally chartered savings and loan association is governed exclusively by federal law. Accordingly, to the extent that counts I, II and III allege claims based on state law, the defendants' motion for summary judgment is **GRANTED.**

## V. *WHETHER FIRREA PREEMPTS FEDERAL COMMON LAW*

Having determined that the standard of care applicable to Home Federal's former directors and officers stems from federal law, I must now consider FIRREA's (12 U.S.C. § 1821(k)) impact on federal common law. 12 U.S.C. § 1821(k) provides in relevant part:

> *Liability of directors and officers.*
>
> A director or officer of an insured depository institution may be held personally liable for monetary damages in any civil action by, on behalf of, or at the request or direction of the Corporation ... acting as conservator or receiver of such institution ... for gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applica-

ble State law. Nothing in this paragraph shall impair or affect any right of the Corporation under other applicable law.

■ The general question of whether a federal statute displaces federal common law is obviously a different inquiry than the inquiry into state law preemption. *City of Milwaukee v. Illinois,* 451 U.S. 304, 316, 101 S.Ct. 1784, 1792, 68 L.Ed.2d 114 (1981). In *Milwaukee,* the Court noted that the important concerns of federalism which exist in an inquiry into the preemptive effect of federal statutes on state law claims, are not present when a federal statute purports to displace federal common law. *Milwaukee,* 451 U.S. at 316–317, 101 S.Ct. at 1792–1793. As the Supreme Court expressed in *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 239, 105 S.Ct. 1245, 1254, 84 L.Ed.2d 169 (1985) (holding that the language of the Nonintercourse Acts did not evidence an intent to displace existing federal common law), the party arguing for preemption bears the burden of establishing congressional intent to displace existing federal law. A subsequent federal statute will preempt federal common law if "the federal statute speaks directly to the question otherwise answered by federal common law." *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 236–237, 105 S.Ct. 1245, 1252, 84 L.Ed.2d 169 (1985) (citations omitted). *See, e.g., FDIC v. Fay,* 779 F.Supp. 66, 67 (S.D.Tex.1991) ("It is a well-established principle of statutory construction that the common law ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose.").

Federal courts have run the gamut on this question. Some have determined that § 1821(k) preempts federal common law (*Resolution Trust Corp. v. Miramon,* 22 F.3d 1357, 1360 (5th Cir.1994)), state common law (*Gaff v. FDIC,* 919 F.2d 384, 391 (6th Cir. 1990)), both federal and state common law (*RTC v. Camhi,* 861 F.Supp. 1121, 1128 (D.Conn.1994)), and neither federal nor state common law (*RTC v. Cityfed Financial Corp.,* 57 F.3d 1231, 1246–1249 (3rd Cir. 1995)).

■ After a review of the relevant case law and legislative history, I conclude that 12

U.S.C. § 1821(k) does not preempt federal common law causes of action that existed prior to the enactment of FIRREA.

### A. The Language of FIRREA

The starting point for construing the applicability of a statute is its plain language. *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 1575–1576, 108 L.Ed.2d 842 (1990). Here, the plain language of § 1821(k) begins with the statement that directors and officers "may be held personally liable ... for gross negligence." Congress' use of the word "may" suggests at the outset that other avenues leading to director liability would also survive the enactment of FIRREA. If Congress meant to establish § 1821(k) as an exclusive means of liability, it could have used the words "may *only* be held personally liable," or similar exclusive language. The Supreme Court in *Tafflin v. Levitt*, 493 U.S. 455, 461, 110 S.Ct. 792, 796, 107 L.Ed.2d 887 (1990) concluded that courts should hesitate to find exclusivity in permissive statutory language such as "may."

In addition to the use of the permissive term "may," § 1821(k) specifically states, "Nothing in this paragraph shall impair or affect any right of the [RTC] under *other applicable law.*" (hereafter the "Savings Clause") (emphasis added). By including the Savings Clause, Congress recognized the existence of additional pre-existing remedies and plainly sought to preserve them. *See, e.g., RTC v. Chapman*, 29 F.3d 1120, 1122 (7th Cir.1994) ("Clauses similar to the final sentence of § 1821(k) regularly are understood to save state law against claims of preemption.") (*citing International Paper Co. v. Ouellette*, 479 U.S. 481, 497–500, 107 S.Ct. 805, 814, 93 L.Ed.2d 883 (1987) (and collected cases).

### B. The Legislative History

This interpretation of section 1821(k) is supported by the legislative history. Congress, in enacting FIRREA, sought to strengthen the hand of federal regulators in their oversight of the savings and loan industry which had suffered from gross mismanagement.[11] Any interpretation of section 1821(k) that had the opposite effect would be clearly misplaced.

The section by section analysis of the new law, drafted by the majority and minority staff of the Senate Banking Committee, is illustrative. With respect to the liability section of FIRREA, the report states:

> New ... [section 1821(k)] enables the FDIC to pursue claims against directors or officers of insured financial institutions for gross negligence (or negligent conduct that demonstrates a greater disregard of a duty of care than gross negligence) or for intentional tortious conduct. This right supersedes State law limitations that, if applicable, would bar or impede such claims. This subsection *does not prevent the FDIC from pursuing claims under State law or under other applicable Federal law,* if such law permits the officers or directors of a financial institution to be sued (1) for violating a lower standard of care, such as simple negligence, or (2) on an alternative theory such as breach of contract or breach of a fiduciary duty.

135 Cong.Rec. S6907, 6912 (June 19, 1989) (emphasis added).[12] When the legislative record is viewed in totality (the Senate Record of April 18 & 19, 1989, 135 Cong.Rec. S4451–52; the House Record of August 3–4,

---

**11.** The Congressional Record is replete with references to the abuses committed by directors and officers of savings and loan industry. Moreover, in a news conference on February 7, 1989, President Bush referred to the FIRREA legislation stating: "[We must] seek out and punish those that have committed wrongdoing in the management of the failed institutions." *Cityfed*, 57 F.3d at 1239 n. 8.

**12.** Some two months after FIRREA was adopted, the Senate Banking Committee published the section by section analysis of the new law quoted

above. Since Congress lacked the benefit of this report prior to voting on FIRREA, proponents of preemption argue that the committee report should be given less effect in determining Congress' intent. *See, FDIC v. Bates*, 42 F.3d 369, 372 (6th Cir.1994) (discounting the importance of the section by section report). Nevertheless, the section by section analysis is an exhaustive report written by the members of the Banking Committee who originally drafted the legislation. Accordingly, it should be considered when determining legislative intent.

1989, 1989 U.S.C.C.A.N. 86, 432; and the Banking Committee's section by section report) the message is clear that Congress intended to strengthen the hand of the federal government by adding weapons to its arsenal: section 1821(k) alongside both state and federal common law suits grounded in simple negligence or breach of fiduciary duty.

To be sure, the Congressional debate did not specifically address FIRREA's impact on federally chartered thrifts subject to federal common law. The focus of the legislative debate was on the relationship between the federal statute and state corporate law, obviously because of the situation facing the legislators at the time of FIRREA's passage. "The likeliest reason for the apparent oversight is that there was no history of having to decide which jurisdiction's law would govern a particular dispute over director's liability." *Chapman,* 29 F.3d at 1126 (Posner, C.J. dissenting). The concerns associated with interstate banking were relatively new and many states, with certain exceptions that the legislation addressed,[13] provided a simple negligence standard.

It would be a mistake for me to construe Congress's silence on such a "technical" issue as an endorsement of wholesale federal common law preemption. This is especially true when viewed in light of Congress' stated concerns regarding federal oversight of all thrifts. As Chief Judge Posner so eloquently put it:

> Congress is not gifted with omniscience and does not have the leisure to be able to tie a pretty ribbon around every piece of legislation, and so it often either overlooks or chooses not to attempt to solve problems that lack present salience or urgency. The use by judges of the form of words that Congress has employed to deal with the problem that was before it—in this case, the problem of states' curtailing the liabilities of directors—to solve a problem of which there is no evidence that Congress was even aware is a formula for the perversion of legislative purpose. We play "Gotcha!" with Congress. We make traps of its words.

*Id.*

The first draft of the Senate bill which became section 1821(k) would have held former directors and officers of failed institutions liable for simple negligence.[14] That version was amended, limiting potential liability to "gross negligence or intentional tortious conduct," together with the Savings Clause which preserved the RTC's rights under then existing law.[15] The amendment reflected two concerns: On the one hand was the concern that the adoption of a negligence threshold would undermine the efforts of states to set more lenient standards to facilitate recruiting directors and officers, at the same time, there was concern lest states go too far to insulate directors and officers from liability. A survey of the state laws at the time reveals that a number of state legislatures had revised corporate laws relating to director and officer liability in an effort to shelter corporate management in the wake of the Delaware Supreme Court's decision in *Smith v. Van Gorkom,* 488 A.2d 858, 871 (Del.1985) (finding directors failure to read the proposed merger agreement before approving sale to be grossly negligent conduct).[16] The *Van Gorkom* decision imposed

---

**13.** As described below, a number of state legislatures had revised their laws in an effort to shelter corporate management after the Delaware Supreme Court's decision in *Smith v. Van Gorkom,* 488 A.2d 858, 871 (Del.1985). See below, p. 22.

**14.** The first draft of the Senate bill which became section 1821(k) would have held former directors and officers of failed depository institutions liable for "any cause of action available at common law, including, but not limited to, negligence, gross negligence, willful misconduct, breach of fiduciary duty, breach of contract, conversion, fraud, waste of corporate assets, and violations of statutes." S.Bill No. 774 section 214(n), 101 Cong., 1st Sess. (April 13, 1989).

**15.** Senator Riegle, the bill's floor manager, proposed the amendment to the liability provision. 135 Cong.Rec. S4451–52 (April 19, 1989) (Riegle (and Garn) Amendment No. 62).

**16.** See, Steven B. Price *FIRREA'S STATUTE ON THE STANDARD OF LIABILITY FOR BANK DIRECTORS AND OFFICERS: THROUGH THE LOOKING GLASS OF NEW TEXTUALISM,* 30 Idaho L.Rev. 219, 229 (1993) (describing the state legislative responses to *Smith v. Van Gorkom* ).

significant liability on directors of the Trans Union Corporation who breached their duty of care to shareholders by failing to obtain the highest bid price in a corporate takeover. *See* Daniel Fischel, *The Business Judgment Rule and the Trans Union Case,* 40 Bus. Law. 1437 (1985).

The result of these concerns was a bill that preempted state laws that insulated directors from anything other than intentional misconduct, coupled with a savings clause that permitted the federal regulators to take advantage of more strict state causes of action. As the Congressional record describes it:

> Under the manager's amendment, state law would be overruled *only to the extent that it forbids* the FDIC to bring suit based on "gross negligence" or an "intentional tort." ... This amendment would thus allow the FDIC to sue a director or officer guilty of gross negligence or willful misconduct, even if State law did not allow it.

135 Cong.Rec. S4238, 4278 (April 19, 1989) (Statement of Senator Riegle) (emphasis added).

No other interpretation makes sense. Reading FIRREA to supplant existing law regarding director and officer liability, would entail absurd results. For example, a shareholder or depositor would be able to bring a claim against a director or officer of a *healthy* thrift for negligent conduct, but once the thrift fails, the RTC would *not* be entitled to sue the same directors for the same negligent conduct. Conceivably, this would make it rational for thrift directors to run their banks into the ground in order to shield themselves from ordinary liability. FIRREA was not intended to create such incentives.

As the Ninth Circuit stated in *McSweeney, supra:*

> Adopting the officers' interpretation of § 1821(k) would lead to absurd results, creating the perverse incentive for a director in an institution that is having financial difficulty to permit the thrift to fall into ruin ... since the director's own exposure would be greatly reduced upon the institution of a receivership. Before the failure a thrift and the involvement of federal regulators, liability would attach for simple negligence. After failure, however, § 1821(k) as interpreted by the officers would preclude negligence liability. We refuse to adopt a construction of FIRREA that would indirectly encourage officers to hasten the demise of a troubled thrift, contrary to the stated intent of Congress to curtail activities of savings associations that pose unacceptable risks to the Federal deposit insurance funds.

*McSweeney,* 976 F.2d at 540–541 (internal citations omitted). I agree with the Ninth Circuit that such a reading is inconsistent with Congress' stated purpose in adopting FIRREA.

If this is an appropriate interpretation of section 1821(k) when applied to state chartered institutions, then there is only one reasonable interpretation of section 1821(k) when applied to federally chartered institutions, i.e. that increasing the arsenal available to regulators supervising federally chartered thrifts would mean being able to take advantage of federal common law negligence standards. It is not reasonable to suggest that the RTC's enforcement powers should be weaker with respect to those institutions that it chartered, than over state chartered institutions.[17]

---

**17.** Proponents of preemption argue that allowing the RTC to proceed under federal common law would undermine the very purpose of FIRREA. See *RTC v. Gallagher,* 10 F.3d 416, 420 (7th Cir.1993). As the court in *Miramon* noted, "Why would the RTC ever bring an action under section 1821(k), where it could bring an action under the federal common law and only be required to prove simple negligence?" *Miramon,* 22 F.3d at 1361.

The answer is straightforward. The focus of the legislators in enacting section 1821(k) was on state chartered thrift institutions. The language

makes perfect sense in connection with a scheme that permitted state standards for the governance of the institutions that were state chartered, except where the state sought to insulate directors and officers for their gross negligence.

That it makes less sense in connection with federal chartered institutions is no reason to validate an interpretation completely at odds with the language of the provision, and the purposes behind the enactment of FIRREA. With respect to federally chartered thrifts—restrict the federal government to suits for gross negligence—would turn the statute on its head, reducing the weap-

In light of the intent of FIRREA, and the presence of the Savings Clause, the statute does not manifest an intent to displace existing federal common law.

## VI. CLAIMS AVAILABLE UNDER FEDERAL COMMON LAW

The defendants argue that the Business Judgment Rule acts as a complete bar to the plaintiff's recovery. Specifically, the defendants argue that "it is no part of the judicial function to substitute the court's business view for that of those vested by law with the control of corporate affairs." Defendant Derderian's Memorandum in Support of Motion for Summary Judgment at p. 9 (quoting *Spiegel v. Beacon Participations, Inc.*, 297 Mass. 398, 433, 8 N.E.2d 895 (1937)).

 The Business Judgment Rule shields directors and officers from liability for corporate decisions made in good faith and after due care. In effect, it allows corporate managers to do their job—take risks in search of return on investment. Nevertheless, the Rule is not without limits, limits framed by the concepts "due care" and "good faith." In addition, the Rule will not protect the director or officer when the decision is the result of an "interested" transaction. Plainly, there are factual questions swirling about these issues.[18]

 The RTC alleges that the defendants failed to follow procedures established by both the FHLBB and the Home Federal Board of Directors in extending commercial real estate loans. With respect to defendants Derderian, Delapa, Turner and Alfred Gladstone, the record supports the RTC's contention that these individuals failed to fully inform themselves and other members of the Home Federal Board of Directors of the risks prior to extending loans for speculative real estate transactions. *See* Section VII(B) *infra*.

With respect to Defendant Sumner Gladstone, the RTC alleges that Gladstone breached both his duty of care—in failing to conduct adequate investigations prior to extending loans—and his duty of loyalty to Home Federal. As to the latter, there is evidence that Sumner Gladstone failed to disclose conflicts of interests to both the Board of Directors and the Executive Committee prior to the bank's approval of commercial property development loans.

Since the RTC has offered evidence that all the defendants failed to demonstrate ordinary or due care in their service as either a director or officer of Home Federal, and that Sumner Gladstone engaged in interested transactions while a director of Home Federal, I find that the Business Judgment Rule does not create a bar to the plaintiff's recovery. Accordingly, the defendants' motion for summary judgment on Counts I, II & III is **DENIED.**[19]

---

ons available to federal regulators with respect to institutions that they most closely supervise.

**18.** The defendants point to the decision in *FDIC v. Niblo*, 821 F.Supp. 441, 458 (N.D.Tex.1993) where the court regarded the Business Judgment Rule as an affirmative defense which may "bar recovery on a claim of breach of duty by a corporation's officers and directors." *Id.* at 458. However, the court's explication of the Business Judgment Rule reveals that it is not a complete defense to the claims alleged here. The *Niblo* court articulated the Rule as:

> a director or officer of a bank shall not be liable for claims against him if, in the discharge of his duties, he exercised ordinary care and acted in good faith and honestly exercised his best business judgment within the limits of the actual authority of his position with the bank. A director or officer of a bank shall not be held liable for an honest mistake of judgment if he acted with due care, in good faith,

and in furtherance of a rational business purpose.

*Id.* at 458 (quoting *FDIC v. Wheat*, 970 F.2d 124, 130–31 n. 13 (5th Cir.1992)).

**19.** In addition, the defendants argue that the RTC cannot establish the required causal nexus between the alleged conduct and the harm suffered by Home Federal. I disagree. According to the Complaint, the Bank suffered directly from the defendants' failure to use ordinary care in extending loans that were not properly collateralized. The harm suffered—that is the borrowers' defaults—was directly related to the defendants' failure to exercise prudence. Moreover, the defendants should note the RTC's burden of establishing causation is low and usually a question of fact left to the jury. *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir.1994) ("breaches of fiduciary relationship in any context comprise a special breed of cases that often loosen the normally stringent requirements of causation and damages.").

## A. *Claim based on Negligence Per Se*

Count II of the Complaint alleges that the defendants failed to follow the regulations of the FHLBB and therefore, were negligent per se. In a negligence per se claim, unlike breach of a fiduciary duty, the standard of care to which the director or officer is held is established by statute, ordinance or regulation. *RTC v. Hess*, 820 F.Supp. 1359, 1368–1369 (D.Utah 1993). According to the First Circuit:

> The doctrine of negligence per se does not have the effect of turning reasonable, nontortious behavior into unreasonable, tortious behavior. Rather it simply allows the presence of a statutory regulation to serve as irrefutable evidence that particular conduct is unreasonable.

*Pratico v. Portland Terminal Company*, 783 F.2d 255, 265 (1st Cir.1985) (finding a claim for negligence per se based upon a violation of OSHA regulations).

The RTC maintains that the defendants' failure to adhere to the requirements of FHLBB Memorandum R41c is such a statutory violation. The defendants argue that Memorandum R41c is not an official regulation promulgated by the FHLBB and therefore, it should not be afforded the weight of a statute or ordinance in establishing the standard of care owed to the corporation.

I disagree. Memorandum R41c is an official interpretation of 12 CFR § 563.17 promulgated by FHLBB pursuant to the Home Owner's Loan Act ("HOLA") 12 U.S.C. § 1461 *et seq.* 12 CFR § 563.17 requires banks to maintain certain records, including appraisal reports for each loan secured by real estate in order to facilitate Bank Board audits. Memorandum R41c spells out exactly what type of appraisal report must be maintained for each real estate loan.

In order to maintain a claim for negligence per se under federal common law, the RTC must establish that: (1) the RTC is a member of the class that the regulation was intended to protect; (2) the regulation was intended to protect against the type of harm Home Federal suffered; and (3) the failure to abide by Memorandum R41c proxi-

mately caused the damage to Home Federal. *Hess*, 820 F.Supp. at 1368. *See also Pratico v. Portland Terminal Co.*, 783 F.2d 255, 262 (1st Cir.1985) (describing negligence per se generally).

### 1. *The RTC as a Member of the Class and the Intent of the HOLA Regulations*

The RTC alleges that as receiver of Home Federal, it is a member of the class of individuals that the Memorandum sought to protect, and that the defendants' failure to abide by the requirements of R41c proximately caused Home Federal's injury (and eventual failure). With respect to the RTC's "class membership," the plaintiff argues that "the regulations in question were specifically intended to benefit the banking institution by insuring that officers and directors of an institution acted prudently." Plaintiff's Memorandum in Opposition to Defendant Gladstone's Motion for Summary Judgment at p. 75.

The defendants argue that the Bank Board regulations and their official interpretations were promulgated to secure the rights of the general public, not the individual depositors of Home Federal. Moreover, the defendants argue that R41c cannot set the standard for a negligence per se claim because the regulations "governing thrift institutions are forward-looking, not retrospective, and they apply to the institution, not directly to the officers and directors." According to the defendants, such regulations are "simply not designed or intended to set the standards for the after-the-fact personal liability of directors and officers." Defendant Delapa's Memorandum in Support at p. 21. I disagree.

As one court concluded, "FDIC regulations were designed to protect depositors, the insurance fund and the public. Thus, the regulations at issue here were not promulgated exclusively for the public's interest." *RTC v. Heiserman*, 839 F.Supp. 1457, 1466 (D.Colo. 1993) (finding a federal common law cause of action for negligence per se for a violation of Memorandum R41b) (internal quotations omitted). The RTC, as the receiver of Home Federal, retains all the rights the Bank had

when it was a going concern. *Chapman,* 29 F.3d at 1124. Included in those rights is the right to bring this suit in an attempt to recoup losses that were allegedly the result of negligent or grossly negligent mismanagement. In addition, for the purposes of determining whether the RTC is a member of the class of persons that Memorandum R41c intended to protect, the RTC as receiver of Home Federal, is the intended beneficiary of regulations promulgated to protect savings and loans from poor management and/or overly risky lending practices.

Therefore, I find that FHLBB Memorandum R41c—the official interpretation of federal regulation 12 CFR § 563.17—was created with the intent to protect federally insured depositary institutions from negligent mismanagement by ensuring that certain documents be produced and maintained for each loan secured by commercial real estate. Moreover, I find that the RTC, as receiver of Home Federal, is one of the intended beneficiaries of Memorandum R41c. Accordingly, the RTC may maintain a claim based upon negligence per se.

## VII. *ADMISSIBILITY OF AFFIDAVITS SUPPORTING THE PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS*

The defendants have challenged the admissibility of certain affidavits and attached documents supporting the RTC's LR 56.1 Statement of Material Facts that the RTC offers in opposition to the summary judgment motions. *See* Fed.R.Civ.P. 56(e). Specifically, the defendants challenge the admissibility of: (1) Home Federal's files (including both loan documents and minutes from the bank's board meetings); (2) memoranda from federal regulators to Home Federal's Board of Directors; and (3) affidavits and attached documents prepared for the purposes of this litigation by the Barrington Consulting Group (the "Barrington Affidavits").

On January 18, 1994, the RTC filed the Affidavit of Maurice J. Whalen. Mr. Whalen, a principal of the Barrington Consulting Group, testified that Barrington personnel reviewed the Home Federal's loan files and made certain "observations, inferences and conclusions" regarding 19 lending relationships which the RTC alleges demonstrate a material issue of fact as to the defendants' mismanagement. At a hearing on February 15, 1994, Judge Keeton ruled that the Whalen affidavit was inadmissible hearsay. Judge Keeton specifically stated:

> Even if the documents, underlying documents are admissible in evidence as business records, which I don't think you've shown to me yet because you haven't shown me the foundation evidence that would make them admissible as business records, but even if you had shown me that, that does not make a summary prepared by somebody else for the purposes of litigation admissible evidence.

Transcript of Hearing before the Honorable Robert E. Keeton, February 15, 1994 at p. 7.[20] Following the hearing, Judge Keeton allowed the RTC 60 days to refile its LR 56.1 Statement with admissible supporting documents.

In response to the Court's direction, the RTC proffered the following evidence in opposition to the motion for summary judgment. It offered affidavits seeking to demonstrate that it was Home Federal's regular business practice to keep records relating to loan transactions, Board of Directors meetings, Executive Committee meetings and correspondence and audit reports from federal regulators. Specifically, the RTC attached affidavits from former Home Federal employees Jeffrey Bourassa and Jack Rinaldi. Bourassa worked for Home Federal as an internal auditor from 1986–1990. During the course of his employment at the bank, Bourassa became familiar with the "regular business habit, routine and practice of [Home Federal] especially with respect to the keeping of records." Bourassa Affidavit at ¶ 4. Rinaldi worked at Home Federal from 1985–1990. According to his affidavit, he "participate[d] not only in the preparation of the minutes of the meetings of the Home Federal board of directors as they were prepared and as they occurred ... but also in the

---

**20.** Judge Keeton's ruling from the bench excluding the RTC's first LR 56.1 Statement was clarified in a written order issued the same day. See Order docket entry 75.

preparation of the minutes of the meetings of the Home Federal Executive Committee as they were prepared and as they occurred" during the period of his employment. Second Affidavit of Jack I. Rinaldi at ¶ 2.

In addition, the RTC offered affidavits establishing the chain of custody of Home Federal's files from Home Federal to the RTC. Beginning with the affidavit of William B. Austin, the RTC submitted some 10 affidavits which describe the route these documents traveled on their way to counsel for the RTC. Moreover, the documents show that upon receivership, the RTC's agents maintained the integrity of the bank's files and relinquished control of the documents only to authorized RTC personnel or their agents. Those individuals, in turn, took care to preserve the form of the records, and delivered the loan files to the Barrington Consulting Group.

Finally, the RTC offered affidavits from the Barrington Consulting Group. Analysts at Barrington reviewed the bank's loan files and noted the absence of certain documents, specifically the appraisal reports, which applicable standards and rules required.

The RTC seeks to introduce this evidence under the "absence of entry" or "negative evidence" exception to the rule against hearsay. Fed.R.Evid. 803(7). Since the Rinaldi and Bourassa filings and the chain-of-custody affidavits establish (a) both Home Federal's internal policies regarding lending and the federal regulators audit requirements, and (b) the trustworthiness or integrity of the bank's records, the absence of certain documents from the files can be offered to show "nonoccurrence or nonexistence" of adequate loan documentation.

The admissibility of each document on summary judgment is governed by Rule 56, Fed.R.Civ.P., which provides that affidavits supporting or opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in

evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Rule 56(e).

### A. Affidavits Relating to Home Federal's Loan Files and the Memoranda From the FHLBB; Affidavits Concerning RTC Custody

The first set of documents described above consist primarily of the loan files and minutes of Board meetings of Home Federal, and memoranda from the FHLBB. Clearly, these documents come within the purview of Fed.R.Evid. 803(6),[21] since the supporting affidavits point out that they were kept in the course of Home Federal's regular business activity. Bourassa Affidavit at ¶¶ 2–10 and Rinaldi Second Affidavit at ¶ 2. In addition, reports from the FHLBB are admissible under the public records exception Fed.R.Evid. 803(8)—as they set forth the "activities of the office or agency." *FDIC v. Mmahat*, 907 F.2d 546, 551 (5th Cir.1990) (finding admission of federal regulator's audits appropriate under Fed.R.Evid. 803(8)). The audit reports would also be admissible under the Fed.R.Evid. 803(6) insofar as they became part of Home Federal's business records. *United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir.1992) ("Rule 803(6) allows business records to be admitted 'if witnesses testify that the records are integrated into a company's records and relied upon in its day to day operations.'"). The affidavits establishing RTC's custody of the Home Federal files are admissible as they are based on personal knowledge of the custodian.

### B. The Barrington Affidavits

The final category relates to certain affidavits and supporting documents prepared by the Barrington Consulting Group. The Barrington Consulting Group was engaged by the RTC to analyze the Bank's loan portfolio. After reviewing Home Federal's

21. The Rule provides:

A memorandum ... of acts [or] events ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular

practice of that business activity to make the memorandum, ... all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

loan files relating to 19 loan transactions, each Barrington analyst prepared an affidavit indicating the documents that were not present in the loan files.

The RTC seeks to introduce the Barrington Affidavits pursuant to Fed.R.Evid. 803(7).[22] According to the RTC, if the bank's loan documents are before the Court via an affidavit from the custodian, and the trustworthiness of the files is established via the chain-of-custody affidavits, then an analysis interpreting the loan documents (whether the files contained the required documentation) is likewise admissible. *See* Transcript of February 15, 1994 Hearing at p. 16.

The defendants uniformly argue that the loan files underlying the Barrington Affidavits lack sufficient trustworthiness to be admissible under Fed.R.Evid. 803(7). In support of this argument, they cast doubt on the RTC's stewardship of the loan files, which it has had since Home Federal entered receivership in 1990. For example, they point out that the RTC itself undermined the reliability of its submission when it informed the Court that it had discovered new loan files while the summary judgment motions were pending. *See* Letter from RTC Counsel to the Court dated March 27, 1995.

Although the defendants are correct in pointing out that the RTC could have been more careful in the handling of Home Federal's files, I find that the inconsistencies described above bear on the weight of the evidence, not their admissibility on summary judgment. *See, United States v. Lee,* 589 F.2d 980, 987 (9th Cir.1979) ("The exceptions to the hearsay rule which provide for the admissibility of negative records in the Federal Rules (Fed.R.Evid. 803(7) and 803(10)) were designed to resolve any doubts about such evidence in favor of admissibility."); *United States v. DeGeorgia,* 420 F.2d 889, 892 (9th Cir.1969) (citing Wigmore's approval of the admissibility of negative evidence).

While I find that the absence of documents in the loan files certainly creates a material issue of fact sufficient to defeat a motion for summary judgment, I do not find the record sufficient to go so far as to create the inference of negligence on the part of defendants.

## VIII. *THE STATUTE OF LIMITATIONS*

The RTC's ability to bring suit as receiver of Home Federal is governed by FIRREA. Specifically, with respect to statutes of limitation, FIRREA provides:

(A) In general

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the [RTC] as conservator or receiver shall be—

> (i) In the case of any contract claim, the longer of—
>
> (I) the six year period beginning on the date the claim accrues; or
>
> (II) the period applicable under State law; and
>
> (ii) in the case of any tort claim, the longer of—
>
> (I) the three-year period beginning on the date the claim accrues; or
>
> (II) the period applicable under State law.

(B) Determination of the date on which a claim accrues

For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of—

> (i) the date of the appointment of the Corporation as conservator or receiver; or

---

**22.** The Rule provides:

The following [is] not excluded by the hearsay rule even though the declarant is available as a witness: ...

(7) Evidence that a matter is not included in the memoranda, reports, records, or data compilations in any form, kept in accordance the

provisions of paragraph (6), to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and preserved, unless the sources of information or other circumstances indicate lack of trustworthiness.

(ii) the date on which the cause of action accrues

12 U.S.C. § 1821(d)(14).

According to the case law, the determination of the relevant limitations period is a two step process. *FDIC v. Dawson,* 4 F.3d 1303, 1307 (5th Cir.1993) *cert. denied* —— U.S. ——, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994). My first task is to determine whether the claims alleged by the RTC were time-barred when Home Federal was taken over by the RTC. Next, if the claims were viable, the period provided by 12 U.S.C. § 1821(d)(14)(A) begins to run.

Since I determined in Section V *supra* that federal law exclusively governs the RTC's claims, I must evaluate the viability of the RTC's claims on the date of receivership. When the federal law fails to articulate a limitations period—as the federal common law action for breach of fiduciary duty and negligence per se does—the court should "borrow the most suitable statute or other rule of timeliness from some other source. We have generally concluded that Congress intended that the courts apply the most closely analogous statute of limitations under state law." *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 158, 103 S.Ct. 2281, 2287, 76 L.Ed.2d 476 (1983).

This inquiry requires me first to determine whether the RTC's claims sound in either tort[23] or contract[24] and then to apply the applicable limitations period. The defendants argue that summary judgment is appropriate because the plaintiff's claims of breach of fiduciary duty and gross negligence are essentially tort actions and are therefore time barred by the applicable Massachusetts statute of limitation. In response, the RTC argues that the defendants' duty derived from their contractual relationship as directors and officers of Home Federal and therefore the Massachusetts—six year—contract statute of limitations applies.[25]

I find that the defendants' fiduciary duty to Home Federal arose from their implied contractual relationship as directors and/or officers of the institution. Accordingly, the appropriate statute of limitations is the six year contract period. Each of the defendants had a fiduciary duty stemming from their implied contractual relationship with Home Federal. Unlike a shareholder's duty to fellow shareholders, *Kirley v. Kirley,* 25 Mass.App.Ct. 651, 652, 521 N.E.2d 1041 (1988), a director or officer's duty is based on mutual promises: compensation in return for loyalty and prudence. Accordingly, just as a suit against Home Federal for failure to compensate its employees would be governed by a six year statute of limitations, a suit by Home Federal (or its receiver) against its directors and officers for failure to exercise due care or loyalty is governed by the contract limitations period. See *FDIC v. Former Officers and Directors of Metropolitan Bank,* 884 F.2d 1304, 1307 (9th Cir.1989) (applying contract statute of limitations to breach of fiduciary duty suit) *cert. denied* 496 U.S. 936, 110 S.Ct. 3215, 110 L.Ed.2d 662; *Barber v. Fox,* 36 Mass.App.Ct. 525, 529, 632 N.E.2d 1246 (1994) (applying six year contract statute of limitations to breach of fiduciary duty claim).

Having determined that the applicable limitations period is six years, and since all loans at issue here originated less than six years prior to the RTC being appointed receiver, none of the claims were time barred when the plaintiff took over the bank. Therefore, since the RTC commenced this action within six years of the origination of the earliest loan in question, the action is timely.

**23.** M.G.L. c. 260 § 2A provides a three year limitations period of tort actions.

**24.** M.G.L. c. 260 § 2 provides a six year limitations period for actions based in contract.

**25.** The RTC argues in the alternative that: (1) even if the tort limitations apply, the claims against the defendants did not accrue until the loans in question went into default at a time well within the three year statute of limitations period; (2) that even if the claims accrued prior to default, the limitations period tolled because the Massachusetts discovery rule tolls the running of the limitations period until the plaintiff knew or should have known of the existence of a claim; and (3) even if the claims accrued prior to default, the doctrine of adverse domination tolled the running of the statute. Because I find that the defendants' obligations to Home Federal derive from an implied employment contract, i.e. the longer limitations period, I need not address these arguments.

## IX. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is **GRANTED** to the extent the plaintiff's claim asserts causes of action based in Massachusetts common law. However, the defendants' motion for summary judgment is otherwise **DENIED**.

**SO ORDERED.**